Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| PASEOS DE DORADO PROPERTY OWNERS ASSOCIATION, INC.<br><br>**Apelante**<br><br>v.<br><br>THE DAWN HOTEL AT DORADO LLC; QB GROUP, LLC; DAVID EFRÒN; PASEO SAN ANTONIO, INC; GERENCIA DE PERMISOS DEL DEPARTAMENTO DE DESARROLLO ECONÒMICO Y COMERCIO; MUNICÍPIO DE DORADO<br><br>**Apelado** | TA2026AP00165<br><br>consolidado<br><br>TA2026AP00179 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala de Bayamón<br><br>Caso Núm.: BY2025CV03889<br><br>Sobre: *Injunction* Estatutario (Art. 14.1, de la Ley 161-209) *Injunction* Preliminar; *Injunction* Permanente, Cumplimiento Específico, Sentencia Declaratoria |

Panel integrado por su presidenta, la jueza Lebrón Nieves, el juez Pagán Ocasio y la jueza Álvarez Esnard

Álvarez Esnard, jueza ponente

## SENTENCIA

En San Juan, Puerto Rico, a 21 de mayo de 2026.

Comparece ante nos Paseos de Dorado Property Owners Association, Inc. ("Paseos de Dorado" o "Asociación") mediante recurso intitulado *Apelación Urgente de la Asociación de Residentes de la Urbanización Paseos de Dorado* presentado el 17 de febrero de 2026. Acude, a su vez, ante nos DBR Dorado Owners, LLC ("DBR") mediante recurso de *Apelación* radicado el 18 de febrero de 2026. Nos solicita la revocación de la *Sentencia* notificada el 12 de febrero de 2026, por el Tribunal de Primera Instancia, Sala Superior de Bayamón ("foro primario", "foro *a quo*" o "tribunal sentenciador"). Por virtud del referido dictamen, el foro primario desestimó con perjuicio la *Segunda Demanda Enmendada* instada por Paseos de Dorado, en torno a la paralización de la construcción de un proyecto hotelero.

Por los fundamentos que expondremos a continuación, *confirmamos* la *Sentencia* apelada.

**I.**

**En aras de facilitar la cabal comprensión sobre la controversia que nos ocupa, conviene exponer una relación de hechos detallada respecto al tracto procesal que rodea al caso de epígrafe.**

El 23 de julio de 2025, Paseos de Dorado instó *Demanda Juramentada* (BY2025CV03889)[1] ante el foro primario sobre *injunction* estatutario[2], interdicto preliminar y permanente, y sentencia declaratoria contra Dawn Hotel, Paseo San Antonio Inc. ("Paseo San Antonio"), el señor David Efrón ("señor Efrón"), QB Group LLC ("QB Group"), el Estado Libre Asociado de Puerto Rico ("ELA"), en representación de la Oficina de Gerencia de Permisos ("OGPe)[3], y el Municipio de Dorado ("Codemandados", en conjunto).[4] En síntesis, alegó que Dawn Hotel es la entidad propietaria de la Finca Núm. 17,547[5] radicada en la Urbanización Paseos de Dorado. Precisó que, a finales del 2024, dicha entidad, por conducto del contratista QB Group, comenzó el desarrollo de un proyecto hotelero en la referida finca.

No obstante, la Asociación arguyó que el proceso de consulta de ubicación y solicitud de la construcción gestionado ante la OGPe contraviene con las condiciones restrictivas que rigen las normas de la urbanización, la cuales están establecidas *Escritura Núm. 12.*

---

[1] Surge del expediente ante nos que, el 8 de abril de 2025, Paseos de Dorado instó *Demanda Juramentada* (BY2025CV01802) ante el foro primario contra The Dawn Hotel ("Dawn Hotel") y QB Group LLC ("QB Group") sobre *injunction* estatutario y permanente para solicitar la paralización de un proyecto hotelero. **No obstante, el 8 de mayo de 2025, el foro *a quo* emitió *Sentencia,* mediante la cual declaró *Con Lugar* la *Solicitud de Desistimiento* presentada por la Asociación.**

[2] Solicitó dicho remedio al amparo de la Ley para la Reforma del Proceso de Permisos de Puerto Rico*,* Ley Núm. 161-2009, según enmendada, 23 LPRA sec. 9011*,* ("Ley Núm. 161-2009")

[3] Especificó que demandó al ELA por entender que OGPe no tenía capacidad jurídica para comparecer por derecho propio en el pleito.

[4] *Véase,* SUMAC TPI, Entrada 1.

[5] Específicamente alegó que dicha finca está segregada de la Finca Núm. 13,041.

Adujo, a su vez, que Dawn Hotel y Paseo San Antonio, junto al desarrollador original del proyecto, el señor Efrón, otorgaron *Escritura de Liberación* para eliminar las condiciones restrictivas que gravan la referida finca. No obstante, catalogó tal proceder contrario a derecho. En vista de ello, solicitó la expedición de los correspondientes remedios interdictales para paralizar el proyecto hotelero, y revocar tanto la consulta de ubicación como la solicitud de permiso de construcción. Igualmente, peticionó que se decretara la nulidad de la *Escritura de Liberación* mediante sentencia declaratoria.

Luego, el 30 de julio de 2025, la Asociación incoó *Primera Demanda Enmendada Jurada*, en la cual nuevamente solicitó la paralización del proyecto hotelero, fundamentada en las mismas alegaciones expuestas en la reclamación original del 23 de julio de 2025.[6] No obstante, puntualizó que radicó este escrito para especificar que la Asociación goza de autoridad para presentar la reclamación, toda vez que cuenta con el aval de la Junta de Directores de Paseos de Dorado a tales efectos. Asimismo, detalló que, anejó a la *Demanda* los siguientes documentos para constatar dicha información: (1) *Certificado de Incorporación de la Asociación*, (2) *Certificaciones Registrales de las fincas 1,532, 17,547, y 13,041*, y (3) *Minuta de la Junta de Directores de la Asociación.*

Así las cosas, 12 de agosto de 2025, Dawn Hotel y Paseo San Antonio radicaron *Moción de Desestimación*, al amparo de la Regla 10.2(5) de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2(5), por considerar que las alegaciones contenidas en la reclamación no justifican la concesión de un remedio.[7] Particularmente, solicitaron la desestimación de las causas de acción concernientes al *injunction* estatutario y la sentencia declaratoria peticionada para declarar la

---

[6] *Véase*, SUMAC TPI, Entrada 16.
[7] *Véase*, SUMAC TPI, Entrada 37.

nulidad del permiso de construcción y la consulta de ubicación. Sobre este particular, argumentaron que el *injunction* contemplado en la Ley Núm. 161-2009, *supra*, requiere la tramitación de un procedimiento sumario de alcance limitado, inaplicable para atender controversias sobre servidumbres privadas. Por otro lado, indicaron que la expedición del permiso de construcción por parte de la OGPe no tiene el efecto de invalidar las condiciones restrictivas que rigen las normas del espacio de la urbanización. A su vez, señalaron, que se debieron agotar los remedios a nivel administrativo para impugnar dicho permiso, así como la consulta ante la OGPe. Por último, advirtieron que existe un problema de ausencia de parte indispensable por no haberse incluido al Profesional Autorizado que expidió el permiso.

Al día siguiente, QB Group presentó *Moción en Unión a Moción de Desestimación*.[8] En esta, informó que está conforme con los argumentos esbozados por Dawn Hotel y Paseo San Antonio, por lo que, solicitó unirse la moción desestimatoria presentada por dichas partes.

**Pendientes de adjudicar las solicitudes de desestimación**, el 14 de agosto de 2025, la Asociación interpuso ***Segunda Demanda Enmendada*** contra los Codemandados originales. Sin embargo, no incluyó como parte al ELA, sino a la OGPe por tener capacidad jurídica para ser demandada.[9] A tales fines, nuevamente solicitó la expedición del *injunction* estatutario (primera causa de acción), a tenor con la Ley Núm. 161-2009, *supra*. Argumentó, en específico, que corresponde la revocación del permiso de construcción porque se concedió fundamentado en información incorrecta o falsa brindada ante la agencia mencionada. A su vez, peticionó la expedición de interdicto preliminar (segunda causa de

---

[8] *Véase*, SUMAC TPI, Entrada 50.
[9] *Véase*, SUMAC TPI, Entrada 69.

acción), así como del *injunction* permanente (tercera causa de acción) para evitar un daño inminente por el desarrollo de la construcción del proyecto hotelero, en contravención a la *Escritura Número 12*. Por otro lado, arguyó que debía decretarse la nulidad de la *Escritura de Liberación* y de la consulta de ubicación, así como del permiso de construcción (cuarta y quinta causa de acción), por considerar que se otorgaron contrarios a derecho. Asimismo, solicitó que, el foro primario reconociera el derecho real que ostenta la Asociación sobre la estructura de acceso controlado de la Avenida Principal Norte, en virtud de un pronunciamiento sentencia declaratoria (sexta causa de acción). Por último, requirió que se impusiera a su favor el pago de una cantidad no menor de cincuenta mil dólares ($50,000.00) por concepto de costas y honorarios de abogados incurridos en la tramitación del litigio (séptima causa de acción).

En vista de lo anterior, el 15 de septiembre de 2025, Dawn Hotel y Paseo San Antonio sometieron *Moción Informativa y/o para Reiterar la Solicitud de Desestimación y la Oposición a la Solicitud de Injunction Preliminar en Relación con la Segunda Demanda Enmendada.*[10] Mediante este escrito, informaron que incorporaron por referencia la totalidad de los argumentos contenidos en su primera moción de desestimación radicada el 12 de agosto de 2025. Puntualizaron, también que, se oponen a la petición de *injunction* preliminar presentada en la *Segunda Demandada Enmendada.*

Por su parte, el 19 de septiembre de 2025, la OGPe presentó *Moción de Desestimación.*[11] En esencia, sostuvo que la determinación final que emitió está revestida de presunción de legalidad y corrección, de conformidad con el Artículo 9.10 de la Ley Núm. 161-2009, *supra.* Igualmente, argumentó que la reclamación

---

[10] *Véase,* SUMAC TPI, Entrada 97.
[11] *Véase,* SUMAC TPI, Entrada 100.

instada no contiene alegación sobre la existencia de fraude, dolo, engaño, extorsión, soborno o la comisión de algún delito al momento de la expedición del permiso de construcción. Adujo, por otro lado, que la expedición del referido permiso de construcción no invalida las condiciones restrictivas existentes. Finalmente, señaló que no se incluyó en el pleito al Profesional Autorizado que expidió el permiso, cuya revocación se solicita, lo cual implica que existe un problema de parte indispensable. Ante tales circunstancias, consideró que correspondía desestimar la *Segunda Demandada Enmendada.*

En reacción, el 1 de octubre de 2025, la Asociación presentó *Oposición a Moción de Desestimación presentada por Dawn Hotel y Paseo San Antonio.*[12] En esta solicitud, precisó que las alegaciones contenidas en la *Segunda Demanda Enmendada,* a la luz de la prueba presentada, evidencian que la Consulta de Ubicación fue emitida mediante información falsa provista por Dawn Hotel y Paseo Antonio ante la OGPE. Por tanto, explicó que, en tal contexto no opera la normativa relacionada con la presunción de corrección y legalidad de las determinaciones administrativas. A la luz de tales hechos, dedujo que no tiene que agotar remedios ante la agencia aludida. Por lo anterior, explicó que la reclamación satisface el estándar de las alegaciones instaurado por la Regla 10.2(5) de Procedimiento Civil, *supra.*

Al día siguiente, Paseos de Dorado radicó *Oposición a Moción de Desestimación Presentada por la OGPe en la Entrada #100 de SUMAC.*[13] En esta, reiteró que los hechos alegados en la reclamación enmendada son específicos, por lo que, permiten conceder un remedio a tenor con el Artículo 14.1 de la Ley Núm. 161-2009, *supra.* Especificó además que, no tiene que incluir como parte indispensable al Profesional Autorizado, toda vez que, en el caso

---

[12] *Véase,* SUMAC TPI, Entrada 106.
[13] *Véase,* SUMAC TPI, Entrada 111.

presente se impugna la Consulta de Ubicación, la cual fue emitida por la Junta Adjudicativa de la OGPe. Por último, insistió en que no tiene que agotar remedios administrativos para cuestionar la consulta de ubicación.

Así las cosas, el 14 de octubre de 2025, el foro primario celebró *Vista de Injunction Preliminar y Permanente*, según consta en la *Minuta* notificada el 21 de octubre de 2025.[14] Durante dicho procedimiento, se discutieron los siguientes asuntos relativos a las aludidas mociones de desestimación y los recursos extraordinarios peticionados:

> **El licenciado Martínez informa que al día de hoy todavía <u>no se ha incluido por la parte demandada a los profesionales que expidieron los permisos e indica que ello está planteado en su moción de desestimación y en la de OGPE</u>. Argumenta en cuanto a la solicitud de intervención. Además, informa que están preparados para ver la vista en el día de hoy, si este Tribunal entendiera que fuese necesario, aunque entienden que se debe mantener el orden de los procedimientos según el Tribunal determinó. Indica que ha habido unos intercambios de naturaleza transaccional entre las partes que, aunque al día de hoy no han rendido provecho, tan reciente como en el día de ayer anduvo en conocimiento que la Asociación convocó una asamblea extraordinaria de todos los titulares para el próximo martes, en donde el punto principal en la agenda es discutir la propuesta que esta parte de buena fe les sometió. En ese sentido, entiende primero se celebre ese procedimiento antes de proceder a una vista evidenciaria.**
>
> **El licenciado Cobián informa que, <u>con relación al asunto del profesional autorizado, el único proceso administrativo que se está impugnando es la consulta de ubicación; argumenta al respecto</u>. Deja claro para récord que la Asociación se opone tenazmente a que se aguante una vista evidenciaria porque vaya a ver una asamblea que está convocando la Asociación porque quiere informar a sus miembros lo que está pasando, mientras el proyecto no se detenga. Solicita, si no se va a ver la vista, si los compañeros quieren dialogar, que detengan el proyecto por 10 o 20 días. Además, informa que hizo unas citaciones en el momento de emplazar tanto a OGPE como al Municipio de Dorado y no le han producido los expedientes certificados.**
>
> **<u>El Tribunal reitera que no va a emitir el "injuntion" sin vista</u>.**
>
> **Se permitirá la intervención, se notificará por escrito.**
>
> **Se señala Vista para el 28 de octubre de 2025 a las 9:30 a.m., de manera presencial.**

---

[14] *Véase*, SUMAC TPI, Entrada 140.

**Se concede hasta el 21 de octubre para replicar a la moción de desestimación presentada por OGPE y la presentada por el licenciado Martínez Piovanetti**. (Citas omitidas).[15]

**Conforme con lo dispuesto en corte abierta, el foro primario declaró *No Ha Lugar* la solicitud de *injunction* preliminar, en virtud de la *Resolución* emitida el 16 de octubre de 2025**.[16]

Continuados los procedimientos, el 20 de octubre de 2025, Dawn Hotel y Paseo San Antonio presentaron *Moción en Cumplimiento de Orden y para Reiterar la Solicitud de Desestimación,* a la cual adjuntaron los siguientes documentos: (1) *Estatutos Paseos de Dorado* (Anejo 1), *Convocatoria Referéndum* (Anejo 2), y *Resultado de Referéndum* (Anejo 3).[17] En esta, señalaron que Paseos de Dorado no sometió la prueba documental pertinente que demostrara que ostenta la debida autorización de sus miembros para instar la *Demanda* de epígrafe. **Particularmente, indicaron que para instar la acción legal se requiere el voto de aprobación del setenta y cinco por ciento (75%) o más de sus miembros, de conformidad con el Artículo IV, inciso (2), de los *By-Laws*[18] que rigen la Asociación. Por tanto, ante la ausencia de prueba documental, infirieron que la radicación del pleito es improcedente en derecho por constituir una decisión unilateral por parte la Junta de Directores, contraria al precitado estatuto**. Por otra parte, reiteraron que procede la desestimación de la reclamación, pues Paseos de Dorado no incluyó en el pleito al Profesional Autorizado que otorgó el permiso de construcción ante la OGPe. De igual modo, enfatizaron que los remedios solicitados no pueden concederse como vía alterna para impugnar colateralmente las determinaciones finales emitidas por la OGPe.

---

[15] *Véase*, SUMAC TPI, Entrada 140, págs. 1-2.
[16] *Véase*, SUMAC TPI, Entrada 133.
[17] *Véase*, SUMAC TPI, Entrada 137.
[18] *Véase*, SUMAC TPI, Entrada 137, Anejo I, págs. 3-4.

**En desacuerdo en cuanto a la denegatoria del *injunction* preliminar, el 21 de octubre de 2025, Paseos de Dorado acudió ante este Tribunal de Apelaciones mediante escrito de *certiorari* (TA2025CE00652).**

En igual fecha, la OGPe presentó ante el foro primario *Moción en Cumplimiento de Orden y Reiterando Solicitud de Desestimación*.[19] En suma, indicó que la Asociación no presentó en su *Demanda* alegaciones sobre conductas específicas de fraude, engaño, extorsión, soborno o la comisión de algún delito, ejecutadas durante la tramitación de la expedición de la Consulta de Ubicación y los permisos. Agregó que, tampoco acumuló como parte indispensable al Profesión Autorizado que evaluó el permiso de construcción ante la OGPe. Ante ello, de nuevo, solicitó la desestimación de la reclamación.

Asimismo, el 26 de octubre de 2025, QB Group presentó *Escrito en Unión a Moción en Cumplimiento de Orden y para Reiterar la Solicitud de Desestimación*, mediante el cual adoptó los argumentos desestimatorios esbozados por Dawn Hotel, Paseo San Antonio y la OGPe.[20]

En respuesta, el 10 de noviembre de 2025, Paseos de Dorado interpuso *Oposición a "Moción en Cumplimiento de Orden y para Reiterar la Solicitud de Desestimación"*.[21] En síntesis, alegó que la Asociación goza de autoridad para hacer valer las condiciones restrictivas que gobiernan las normas de la comunidad. En esa dirección, puntualizó que no impugna el permiso de construcción, sino que cuestiona la Consulta de Ubicación por ser contraria a las referidas condiciones restrictivas. Insistió en que la OGP emitió la Consulta de Ubicación a base de información falsa y fraudulenta.

---

[19] *Véase*, SUMAC TPI, Entrada 141.
[20] *Véase*, SUMAC TPI, Entrada 148.
[21] *Véase*, SUMAC TPI, Entrada 154.

Por lo que, consideró que su causa de acción cumple con los elementos requeridos en el Artículo 14.1 de la Ley Núm. 161 2009, *supra,* para su ventilación ante el foro primario. Por último, reiteró que no existe un problema de falta de parte indispensable.

Con posterioridad, en atención al interdicto preliminar denegado, este Foro Intermedio (Panel X) dictó *Sentencia* notificada el 12 de noviembre de 2025. En virtud de este dictamen, expidió el auto de *certiorari* solicitado por Paseos de Dorado, y en efecto, concedió el *injunction* preliminar, al amparo del siguiente razonamiento:

> **En aras de salvaguardar la integridad del proceso judicial y evitar un perjuicio que podría tornarse irreparable, procede expedir el auto de *certiorari*, revocar la *Resolución* recurrida y ordenar la expedición de un *injunction* preliminar, el cual deberá permanecer vigente hasta que se celebre la vista correspondiente y se resuelva la solicitud en sus méritos, con la comparecencia de todas las partes afectadas**. (Énfasis nuestro).[22]

Disconformes, el 24 de noviembre de 2025, Dawn Hotel, Paseo San Antonio y QB Group recurrieron al Tribunal Supremo de Puerto Rico mediante recurso de *certiorari* y solicitud de auxilio de jurisdicción.[23] No obstante, el 26 de noviembre de 2025, el Máximo Foro emitió *Resolución*, notificada el 2 de diciembre de 2026, en la cual declaró *No Ha Lugar* ambas peticiones.[24] **En este determinación, resolvió que "estamos confiados en que el Tribunal de Primera Instancia celebrará vista de *injunction* permanente con la prontitud que amerita".**[25]

**No obstante, aún pendientes de adjudicar las mociones de desestimación,** 19 de diciembre de 2025, DBR Dorado Owner, LLC ("DBR"), presentó *Solicitud de Intervención*, a la cual adjuntó un documento intitulado *Demanda de Intervención*.[26] En esta, informó

---

[22] *Véase*, SUMAC TPI, Entrada 160, pág. 18.
[23] *Véase*, SUMAC TPI, Entrada 161.
[24] *Véase*, SUMAC TPI, Entrada 163.
[25] *Véase*, SUMAC TPI, Entrada 163, pág. 1.
[26] *Véase*, SUMAC TPI, Entrada 174.

que es titular en pleno dominio de la Finca Núm. 1,115, según se estableció en la *Escritura Núm. 12*, bajo la clasificación de *Neighboring Property*. Además, aseveró que, DBR posee derechos adicionales derivados de la *Escritura Núm. 8*, suscrita entre Dorado Beach Hotel Corporation, —entidad de la cual es sucesora— y el señor Efrón, la cual consta inscrita ante el Registro de la Propiedad a favor de la Finca Núm. 1,115. Particularizó que, la *Escritura Núm. 8* establece un régimen independiente de condiciones restrictivas sobre la Finca Núm. 1,534, la cual es la finca matriz de la Finca Núm. 17,547, por lo que, está facultada a exigir su cumplimiento. Así contextualizado, puntualizó que cualquier determinación que emita el foro primario concerniente a la *Escritura de Liberación* o respecto al proyecto de Dawn Hotel tendrá un impacto directo y sustancial sobre los derechos que ostenta. Por tal razón, peticionó que se autoriza su intervención en el caso de epígrafe.

**Evaluada la moción que antecede, el 21 de enero de 2026, el foro *a quo* emitió *Orden*, notificada al día siguiente, en la cual permitió la intervención de DBR.**[27]

Oportunamente, el 22 de enero de 2026, Dawn Hotel y Paseo Antonio radicaron *Moción de Reconsideración.*[28] Como argumento central, señalaron que el foro primario incidió al adjudicar la solicitud de intervención, sin que el Tribunal de Apelaciones expidiese el mandato referente a una determinación sobre el *injunction* preliminar. De igual modo, sostuvieron que la petición de intervención se presentó en una etapa tardía, por lo que, razonaron que es incompatible con las normas pertinentes a la economía procesal. Asimismo, adujeron que no procede su intervención, pues consideran que los intereses de DBR no quedarían afectados por la

---

[27] *Véase*, SUMAC TPI, Entrada 188.
[28] *Véase*, SUMAC TPI, Entrada 190.

disposición final del pleito, de conformidad con la Regla 21.1(b) de Procedimiento Civil, 32 LPRA Ap. V, R. 21.1(b).

**Al día siguiente, entiéndase, el 23 de enero de 2026, este Foro Intermedio, por conducto de su Secretaría, expidió el *Mandato* referente al caso al Caso Núm. TA2025CE00652 resuelto el 12 de noviembre de 2025.**[29] **Luego, el 26 de enero de 2026, nuestro Máximo Foro emitió *Mandato* en cuanto al Caso Núm. CC-2025-841 resuelto 26 de noviembre de 2025.**[30]

Continuados los trámites a nivel del foro primario, el 9 de febrero de 2026, DBR presentó *Oposición a Moción de Reconsideración*.[31] En su escrito, argumentó que el foro *a quo* tenía jurisdicción para adjudicar la *Solicitud de Intervención* por tratarse de un asunto estrictamente procesal que no incidía sobre la controversia objeto de revisión ante el foro intermedio. A su vez, reiteró que procede la autorización de su intervención en el litigio presente, toda vez que cumple con los criterios establecidos en la Regla 21.1(b) de Procedimiento Civil, *supra*. Al respecto, enfatizó que ostenta un interés directo, real y jurídicamente protegido a la luz de los derechos reconocidos en la *Escritura Núm. 12* y la *Escritura Núm. 8*. En efecto, explicó que, si no se permite su intervención, dichos intereses no estarán adecuadamente representados.

Evaluados sus respectivos argumentos, el foro primario emitió *Sentencia*, notificada el 12 de febrero de 2026, en la cual declaró *Con Lugar* las mociones de desestimación aludidas, respecto a la *Segunda Demanda Enmendada*.[32] En el escolio número (1), brindó el siguiente pronunciamiento concerniente a la autoridad de la Asociación para incoar la reclamación de epígrafe:

> **En particular, los codemandados plantearon que el Artículo IV(2) de los Estatutos de la Asociación requiere el voto afirmativo del setenta y cinco por ciento (75%) de**

---

[29] *Véase*, SUMAC TPI, Entrada 191.
[30] *Véase*, SUMAC TPI, Entrada 197.
[31] *Véase*, SUMAC TPI, Entrada 200.
[32] *Véase*, SUMAC TPI, Entrada 202.

**los votos emitidos para aprobar acciones sometidas a referéndum de los miembros. <u>Surge del expediente que la Junta de Directores sometió a referéndum el curso de acción a seguir respecto a esta controversia, pero que solo el sesenta y cinco por ciento (65%) de los votos emitidos —de una participación del cuarenta y uno por ciento (41%) de los miembros— favoreció proseguir con la acción legal</u>. Los codemandados argumentaron que, a pesar de no alcanzarse el umbral requerido, la Junta de Directores procedió con la demanda y no informó este resultado al Tribunal cuando se le requirió acreditar su legitimación activa. <u>No obstante, dado que la demanda se desestima por otros fundamentos independientes, este Tribunal no entra a resolver esta cuestión.</u> Asimismo, en atención a lo aquí resuelto, se hace innecesario adjudicar la controversia relacionada con la validez de la Escritura Núm. 3 del 21 de abril de 2025, titulada Liberación de Condiciones Restrictivas, otorgada ante el Notario Winston Vidal Gambaro, así como la defensa relacionada sobre la razonabilidad de la modificación o liberación de las condiciones restrictivas bajo los principios del derecho común.**[33] (Énfasis nuestro).

Respecto a la solicitud de intervención sometida por DBR, declaró *Con Lugar* la reconsideración presentada por Dawn Hotel y Paseo San Antonio, y dejó sin efecto la *Orden* emitida el 21 de enero de 2026, según consta en el escolio (2) contenido en la *Sentencia*, objeto de revisión judicial:

**Mediante la presente Sentencia se deja sin efecto la Orden del 21 de enero de 2026 (Entrada Núm. 188) que autorizó la intervención de DBR Dorado Owner, LLC, y se declara Ha Lugar la Moción de Reconsideración presentada por los codemandados The Dawn Hotel at Dorado, LLC y Paseo San Antonio, Inc. (Entrada Núm. 190). Dicha Orden fue dictada antes de que este Tribunal recibiera el mandato del Tribunal de Apelaciones, el cual fue remitido el 23 de enero de 2026. Conforme la norma establecida en Pérez ex parte v. Depto. de la Familia, 147 DPR 556, 570 (1999), <u>este Foro carecía de jurisdicción para adjudicar la solicitud de intervención mientras el mandato del foro revisor no hubiera sido remitido, pues "[s]i el tribunal de primera instancia resolviese o actuase sobre algún asunto paralizado, dicha actuación sería nula"</u>. Id. Véase además Colón y otros v. Frito Lays, 186 DPR 135, 151-155 (2012). En atención a lo resuelto en esta Sentencia, el Tribunal concluye que la solicitud de intervención ya no es oportuna en esta etapa de los procedimientos para propósitos de lo dispuesto en la Regla 21 de Procedimiento Civil, s*upra*.**[34] **(**Énfasis nuestro).

En lo pertinente a las mociones de desestimación, formuló las siguientes determinaciones de hechos:

**1. El 28 de diciembre de 1995, David Efrón otorgó la Escritura Núm. 12, titulada Declaration of Protective**

---

[33] *Véase*, SUMAC TPI, Entrada 202, pág. 4 esc. 1.
[34] *Véase*, SUMAC TPI, Entrada 202, pág. 5 esc. 2.

Covenants and Restrictions on Construction for Paseos de Dorado, mediante la cual estableció un esquema de desarrollo para crear la comunidad residencial conocida como Paseos de Dorado.

2. El 30 de julio de 2020, Paseo San Antonio, Inc. solicitó ante la OGPe una Consulta de Ubicación para el desarrollo de un proyecto de usos mixtos en la Finca Núm. 13,041 del Registro de la Propiedad de Bayamón, que incluiría un hotel con facilidades comerciales accesorias, en una parcela que no estaba desarrollada.

3. La solicitud de Consulta de Ubicación fue anunciada mediante rótulos colocados en la parcela conforme a los requisitos reglamentarios, incluyendo un rótulo visible desde el camino conducente a una de las entradas de la Urbanización Paseos de Dorado. Además, surge de la Resolución relacionada con la Consulta de Ubicación que esta fue notificada a los colindantes, incluyendo la única asociación de los proyectos residenciales de la Urbanización colindante directamente con el proyecto de Dawn Hotel, a saber, Paseo Las Palmas, cuyos titulares también son miembros de la Asociación de Paseos de Dorado.

4. El 20 de noviembre de 2020, la OGPe emitió una determinación "FAVORABLE" mediante la cual aprobó la Consulta de Ubicación Núm. 2019 252023-CUB-001362 para el desarrollo del proyecto hotelero.

5. <u>Desde la aprobación de la Consulta de Ubicación en noviembre de 2020 hasta la presentación de la demanda original en abril de 2025, transcurrieron más de cuatro (4) años durante los cuales la Asociación no presentó impugnación alguna ante la OGPe, ante ningún foro judicial ni mediante reclamación extrajudicial</u>.

6. Según surge de las propias alegaciones de la Segunda Demanda Enmendada, en su párrafo 63, <u>la primera invocación de la Asociación respecto a las condiciones restrictivas ocurrió mediante una carta enviada el 27 de enero de 2025</u>: "El 27 de enero de 2025, la Junta de Directores de la Asociación le cursó una comunicación a Dawn Hotel informándole que había comenzado un proceso de investigación, orientación y análisis respecto al proyecto que se proponía construir en la Finca # 17,547. Adicionalmente, la Junta de la Asociación advirtió que la carta debía servir como 'notificación formal de que debía cesar y desistir inmediatamente del desarrollo del hotel y locales comerciales' indicando que constituía una violación de las condiciones restrictivas según establecidas en la Escritura # 12".

7. El 3 de septiembre de 2024, se segregó de la Finca Núm. 13,041 una parcela de 3.1593 cuerdas, a la cual se le asignó el número de Finca 17,547, y fue vendida a The Dawn para el desarrollo del proyecto hotelero.

8. A finales del 2024, Dawn Hotel, por conducto de su Contratista, el demandado QB Group, comenzó la construcción del hotel en la Finca # 17,547 amparándose en los permisos de construcción expedidos en los casos 2019 252023-PCOC-304608 y 2019-252023-PCOC-307695. Específicamente, una estructura de siete (7) pisos de altura que consistirá en un hotel de aproximadamente 173 habitaciones, facilidades recreativas, un edificio para locales

> **comerciales de aproximadamente 17,500 pies cuadrados, 239 estacionamientos y otras facilidades.**
>
> 9. **Se puede inferir de tales alegaciones específicas de la Segunda Demanda Enmendada que la construcción del desarrollo hotelero inició tras una inversión significativa y dedicación de esfuerzos sustanciales de los codemandados y en virtud de un financiamiento sustancial provisto por terceros, así como con el apoyo de las entidades gubernamentales competentes.**
>
> 10. **La Asociación presentó su demanda original el 8 de abril de 2025 en el caso BY2025CV01802. El 8 de mayo de 2025 desistió de dicha demanda tras la inscripción de una Escritura de Liberación otorgada por el desarrollador original.**
>
> 12. **[sic] En la Segunda Demanda Enmendada, la Asociación admite expresamente que "desconoce si la titularidad de la Avenida Principal Norte fue transferida" al Municipio de Dorado y que "desconoce si hubo una transferencia" de dicha vía.**
>
> 13. [sic] **Los permisos de construcción impugnados fueron expedidos por un Profesional Autorizado que no ha sido incluido como parte en el presente litigio.**[35] (Énfasis nuestro).

De conformidad con lo anterior, el foro primario resolvió que el remedio de *injunction* estatutario y la sentencia declaratoria no constituyen los mecanismos adecuados para impugnar la Consulta de Ubicación y el permiso de construcción del proyecto hotelero. Sobre este particular, razonó que Paseos de Dorado debió agotar los remedios ante la OGPe para cuestionar la determinación final emitida por dicha agencia, la cual está revestida de presunción de corrección y legalidad. Igualmente, estableció que la Asociación no incluyó como parte indispensable al Profesional Autorizado que atendió el caso ante la agencia mencionada, lo cual impide adjudicar la controversia.

Por otro lado, concluyó que la Asociación incurrió en conducta constitutiva de incuria. Al respecto destacó que, el rótulo sobre la Consulta de Ubicación se anunció en el año 2020. Sin embargo, precisó que Paseos de Dorado esperó hasta el 27 de enero 2025 para cursar una carta destinada a Dawn Hotel, en la cual le informó que había iniciado un proceso investigativo y de orientación sobre el

---

[35] *Véase*, SUMAC TPI, Entrada 202, págs. 6-8.

proyecto de construcción en la Finca Núm. 17,547. Por último, dispuso que, también, procede la desestimación de las alegaciones sobre el supuesto traspaso de titularidad de la Avenida Principal Norte, puesto que tales señalamientos son especulativos y no permiten inferir razonablemente las conductas alegadas, lo cual es contrario al estándar de plausibilidad imperante en nuestro ordenamiento jurídico. En vista de lo anterior, concluyó que no procede la concesión de honorarios de abogados solicitados, en concepto de temeridad.

Inconforme, el 17 de febrero de 2026, Paseos de Dorado acudió a este Tribunal de Apelaciones mediante *Apelación Urgente de la Asociación de Residentes de la Urbanización Paseos de Dorado* (TA2026AP00165)*,* en la cual esbozó los siguientes señalamientos de error:

> PRIMER ERROR: ERRÓ EL TPI AL REVOCAR LA SENTENCIA FINAL Y FIRME DE ESTE TRIBUNAL DE APELACIONES, LA CUAL CONSTITUYE LEY DEL CASO, A LOS EFECTOS DE QUE SE DEBE MANTENER EL INJUNCTION PRELIMINAR HASTA QUE SE CELEBRE LA VISTA DE INJUNCTION PERMANENTE Y SE ADJUDIQUE LA LEGALIDAD DE LA ESCRITURA DE LIBERACIÓN EN SU MÉRITOS.
>
> SEGUNDO ERROR: ERRÓ EL TPI AL DESESTIMAR LA TERCERA CAUSA DE ACCIÓN DE INJUNCTION PERMANENTE PARA PARA DETENER EL PROYECTO COMERCIAL-HOTELERO BAJO EL ARGUMENTO DE "INCURIA", YA QUE EL RÉCORD DEL CASO DEMUESTRA QUE LA ASOCIACIÓN ACTUÓ DILIGENTEMENTE, Y PORQUE LOS APELADOS NO TIENEN LAS "MANOS LIMPIAS" Y, POR LO TANTO, ESTÁN IMPEDIDOS DE LEVANTAR DICHA DEFENSA.
>
> TERCER ERROR: ERRÓ EL TPI AL DESESTIMAR LA SEGUNDA, TERCERA Y CUARTA CAUSA DE ACCIÓN - SOBRE INJUNCTIOIN PRELIMINAR Y PERMANENTE Y NULIDAD DE LA ESCRITURA DE LIBERACIÓN- PORQUE LA SERVIDUMBRE EN EQUIDAD ESTÁ EN VIGOR Y LA LLAMADA ESCRITURA DE LIBERACIÓN ES NULA COMO CUESTIÓN DE DERECHO.
>
> CUARTO ERROR: ERRÓ EL TPI AL DESESTIMAR LA SEXTA CAUSA DE ACCIÓN, EN LA QUE LA ASOCIACIÓN SOLICITA QUE SE LE RECONOZCAN SUS DERECHOS REALES SOBRE LA ESTRUCTURA DE CONTROL DE ACCESO, YA SEA MEDIANTE LA FIGURA DE SERVIDUMBRE DE PASO DE SIGNO APARENTE BAJO EL CÓDIGO CIVIL DE 1930, O BAJO LA FIGURA DE LA USUCAPIÓN.
>
> QUINTO ERROR: QUINTO ERROR: ERRÓ EL TP AL DESESTIMAR LA PRIMERA CAUSA DE ACCIÓN DE INJUNCTION ESTATUTARIO BAJO LA LEY 161-2009, Y LA

QUINTA CAUSA DE ACCIÓN PARA ANULAR LA CONSULTA DE UBICACIÓN.

SEXTO ERROR: ERRÓ EL TP AL DESESTIMAR LA SÉPTIMA CAUSA DE ACCIÓN PARA RECOBRAR LOS GASTOS Y HONORARIOS DE ABOGADOS BAJO EL ARTÍCULO XI, SECCIÓN 4, DE LA ESCRITURA # 12.

En igual fecha, la Asociación sometió *Moción en Auxilio de Jurisdicción.* Requirió la intervención inmediata de esta Curia para evitar un daño irreparable derivado del desarrollo del proyecto hotelero. Tras examinar su solicitud, emitimos *Resolución,* en la cual declaramos *Ha Lugar* el auxilio de jurisdicción peticionado.[36]

Al día siguiente, el 18 de febrero de 2026, DBR recurrió ante este Foro Intermedio mediante escrito denominado *Apelación* (TA2026AP00179), en el cual presentó los siguientes señalamientos de error:

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR CON LUGAR LA MOCIÓN DE RECONSIDERACIÓN PRESENTADA POR LOS APELADOS Y, EN CONSECUENCIA, AL DEJAR SIN EFECTO LA ORDEN QUE AUTORIZÓ LA INTERVENCIÓN DE DBR COMO PARTE CODEMANDANTE

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DESESTIMAR LAS RECLAMACIONES SOBRE INJUNCTION PERMANENTE Y SENTENCIA DECLARATORIA SOBRE LA NULIDAD DE LA ESCRITURA DE LIBERACIÓN Y PARA IMPEDIR LA VIOLACIÓN DE LAS CONDICIONES RESTRCTICTIVAS.

Luego de una serie de acontecimientos procesales a nivel apelativo, el 23 de febrero de 2026, esta Curia dictó *Resolución,* en la cual consolidó ambos recursos por recurrir del mismo dictamen.

Así las cosas, el 18 de marzo de 2026, Dawn Hotel, Paseos San Antonio y QB Group sometieron conjuntamente dos escritos intitulados así: (1) *Alegato en Oposición al Recurso de Oposición TA2026AP00165,* y (2) *Alegato en Oposición Al Recurso De Apelación TA2026Ap00179.* En virtud de estos escritos, arguyeron que el foro primario "ejerció su deber jurisdiccional de atender asuntos dispositivos de umbral antes de celebrar una vista en los méritos".[37]

---

[36] *Véase* SUMAC TA, Entrada 4.
[37] Véase, SUMAC TA, Entrada 74, pág. 74.

A diferencia de la Asociación, sostuvieron que la doctrina de incuria aplica al caso de epígrafe, puesto que Paseos de Dorado aguardó por un periodo de más de cuatro (4) años para instar la reclamación, a pesar de que tenía conocimiento de asuntos importante del proyecto hotelero desde etapas tempranas. **Por otro lado, subrayaron que, el *injunction* estatutario del Artículo 14.1 de la Ley de Permisos, *supra,* no es el vehículo procesal adecuado para cuestionar la determinación de la OGPe vinculada con la Consulta de Ubicación y los permisos de construcción.** Por último, en cuanto al recurso radicado por DBR, argumentaron que, no procede atender los señalamientos esbozados por dicha parte, puesto que la *Demanda* no se instó en su contra, y, además, no es una parte con interés de conformidad con la Regla 21 de Procedimiento Civil, 32 LPRA Ap. V., R. 21.

De manera independiente, la OGPe radicó *Alegato en Oposición a Apelación* el 19 de marzo de 2026, dirigido exclusivamente a la atención del quinto señalamiento de error levantado en el recurso TA2026AP00165. Mediante este escrito, enfatizó que la determinación relativa a la expedición de permiso goza de presunción de corrección y legalidad, salvo medie fraude, dolo, engaño, extorsión, soborno o la comisión de algún delito. Sin embargo, expresó que la Parte Apelante no levantó alegaciones específicas que constaten que la agencia haya incurrido en tales conductas. Consideró, además que, tampoco procede la tramitación del proceso independiente para solicitar el recurso extraordinario, al amparo del Artículo 14.1 de la Ley Núm. 161-2009, *supra,* porque la reclamación carece de alegaciones que establezcan, de modo específico, que la solicitud ante la OGPe contenía información falsa o incorrecta. A su vez, resaltó que la expedición de un permiso por parte de una agencia administrativa no tiene el efecto de anular las

restricciones privadas que pudiesen resultar inconsistentes con el permiso concedido, según establece la jurisprudencia vigente.

Con el beneficio de la comparecencia de las partes, procedemos a exponer la normativa jurídica pertinente a la controversia ante nuestra consideración.

## II.

### A. Deber ministerial de auscultar la jurisdicción

Es norma reiterada que, "la jurisdicción es el poder o la autoridad que posee un tribunal o un organismo administrativo para considerar y decidir casos o controversias con efecto vinculante para las partes". *Muñoz Barrientos v. ELA et al.*, 212 DPR 714, 726 (2023); *Adm. Terrenos v. Ponce Bayland*, 207 DPR 586, 600 (2021). Véase, también, *Mun. Río Grande v. Adq. Finca et al.*, 2025 TSPR 36, 215 DPR __ (2025). Por su transcendencia, el primer factor a considerar en toda situación jurídica que se presente ante un foro adjudicativo es el aspecto jurisdiccional. *Friger Salgueiro v. Mech-Tech College, LLC y otros*, 2026 TSPR 30, 218 DPR ___ (2026); *FCPR v. ELA et al.*, 211 DPR 521, 30 (2023). Así, pues, "[l]os asuntos relacionados con la jurisdicción de un tribunal son privilegiados y deben atenderse con preeminencia". *Pérez Rodríguez v. López Rodríguez et al.,* 210 DPR 163, 178, (2022); *Allied Mgmt. Group. v. Oriental Bank,* 204 DPR 374, 386 (2020).

A la luz de esta normativa, el Tribunal Supremo de Puerto Rico ha establecido que constituye un deber ministerial atender los asuntos jurisdiccionales, **como cuestión principal**:

> **La jurisdicción no se presume ya que, previo a la consideración en los méritos de un recurso o una vez cuestionada su jurisdicción, es deber ministerial de todo tribunal evaluar si la posee, pues ello incide directamente sobre el poder mismo para adjudicar una controversia**. *Maldonado v. Junta de Planificación*, 171 DPR 46, 55 (2007); *Carattini v. Collazo Syst. Analysis, Inc.,* 158 DPR 345, 355 (2003). (Énfasis nuestro).

De dictarse sentencia sin resolver el asunto jurisdiccional, entonces el decreto será nulo, es decir, jurídicamente inexistente o

*ultravires. Rodríguez Vázquez v. Hosp. Auxilio Mutuo,* 2025 TSPR 55, 215 DPR ___ (2025); *Maldonado v. Junta de Planificación, supra,* pág. 55. Por consiguiente, "[s]i un tribunal carece de jurisdicción, solo resta así declararlo y desestimar la reclamación sin entrar en los méritos de la controversia". *Friger Salgueiro v. Mech-Tech College, LLC y otros, supra; FCPR v. ELA et al., supra,* pág. 530.

### B. Moción de desestimación, al amparo de la Regla 10.2 de Procedimiento Civil

La Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2, permite solicitar la desestimación de una acción legal cuando de las alegaciones resulte evidente que prosperará alguna de las defensas afirmativas. *Collazo Muñiz v. Aliss,* 2025 TSPR 22, 215 DPR ___ (2025) (citando a *Sánchez v. Aut. de los Puertos,* 153 DPR 559, 569 (2001)). Véase también, *Inmob. Baleares et al. v. Benabe et al.* 214 DPR 1109, 1128 (2024) (citando a *Conde Cruz v. Resto Rodríguez et al.,* 205 DPR 1043, 1065 (2020)). A tales efectos, la precitada disposición reglamentaria fija los siguientes fundamentos para solicitar la desestimación: **(1) falta de jurisdicción sobre la materia**; (2) falta de jurisdicción sobre la persona; (3) insuficiencia del emplazamiento; (4) insuficiencia del diligenciamiento del emplazamiento; **(5) dejar de exponer una reclamación que justifique la concesión de un remedio**; y **(6) dejar de acumular una parte indispensable**. 32 LPRA Ap. V, R. 10.2. Veamos.

Respecto a la desestimación por ausencia de jurisdicción sobre la materia, reconocida en el inciso (1) de la disposición procesal precitada, nuestro Máximo Foro ha reconocido su importancia, según lee a continuación:

> ***Como vemos, la primera de las defensas reconocidas por la Regla 10.2 de Procedimiento Civil, supra, es la falta de jurisdicción sobre la materia. Su importancia estriba en que, al momento de adjudicar cualquier controversia, los tribunales deben tener jurisdicción sobre la materia en cuestión y sobre las partes litigiosas.*** *Rodríguez Vázquez v. Hosp. Auxilio Mutuo, supra; Cobra*

*Acquisitions, LLC v. Mun. de Yabucoa*, 210 DPR 384, 394 (2022); *Shell v. Srio. Hacienda,* 187 DPR 109, 122 (2012). (Énfasis nuestro).

En ese aspecto, la jurisdicción sobre la materia "es la capacidad del tribunal para atender y resolver una controversia sobre un aspecto legal". *Cobra Acquisitions v. Mun. Yabucoa, supra,* (citando a *Rodríguez Rivera v. De León Otaño,* 191 DPR 700, 708 (2014)). La falta de jurisdicción sobre la materia acarrea las siguientes consecuencias:

> **(1) no es susceptible de ser subsanada; (2) las partes no pueden voluntariamente conferírsela a un tribunal como tampoco puede éste arrogársela; (3) conlleva la nulidad de los dictámenes emitidos; (4) impone a los tribunales el ineludible deber de auscultar su propia jurisdicción; (5) impone a los tribunales apelativos el deber de examinar la jurisdicción del foro de donde procede el recurso, y (6) puede presentarse en cualquier etapa del procedimiento, a instancia de las partes o por el tribunal *motu proprio.* MCS *Advantage v. Fossas Blanco et al.,* 211 DPR 135, 145 (2023); *Beltrán Cintrón et al. v. ELA et al.,* 204 DPR 89, 101-102 (2020).

Ahora bien, conviene explicar que, en Puerto Rico opera el principio de jurisdicción general. Lo anterior implica que los tribunales ostentan autoridad para atender cualquier causa de acción que presente una controversia propia para adjudicación, a menos que no tengan jurisdicción sobre la materia. *Beltrán Cintrón et al. v. ELA et al.,* 204 DPR 89, 101 (2020) (citando a *Rodríguez Rivera v. De León Otaño, supra,* pág. 708 (2014)). No obstante, para privar a un tribunal de la jurisdicción general es necesario que así se haya dispuesto expresamente en algún estatuto o que ello surja del mismo por implicación necesaria. *Rodríguez Rivera v. De León Otaño, supra,* págs. 708-709. Es decir, "esta capacidad solo puede ser limitada por el Estado, quien puede otorgar o privar a un tribunal de jurisdicción sobre la materia mediante legislación a esos efectos". *Beltrán Cintrón et al. v. ELA et al, supra,* pág. 101. Así que, "si un tribunal determina que carece de jurisdicción sobre la materia para atender determinado asunto, solo resta declararlo así y

desestimar la reclamación sin entrar en los méritos de la controversia". *MCS Advantage v. Fossas Blanco et al., supra; Allied Mgmt. Group v. Oriental Bank,* 204 DPR 374, 385 386 (2020).

Por otro lado, el inciso (5) de la Regla 10.2 de Procedimiento Civil, *supra,* permite desestimar una demanda cuando deja de exponer una reclamación que justifique la concesión de un remedio. Ante tales contextos, los tribunales están obligados a tomar como ciertos todos los hechos bien alegados que hayan sido aseverados de manera clara y concluyente[38] y, a su vez, considerarlos de la forma más favorable a la parte demandante. *BPPR v. Cable Media,* 2025 TSPR 1, 215 DPR___ (2025); *Eagle Security v. Efrón Dorado et al.,* 211 DPR 83, 84 (2023) (citando a *González Méndez v. Acción Social et al.,* 196 DPR 213, 234 (2016)). En la atención de esta solicitud, "el tribunal debe determinar si, a base de esos hechos aceptados como ciertos, la demanda establece una reclamación plausible que justifique la concesión de un remedio. Es decir, una reclamación válida". *Saint Mary Investments, LLC v. Denton Morales y otros,* 35, 2026 TSPR 35, 218 DPR ___ (2026); *Costas Elena y otros v. Magic Sport y otros,* 213 DPR 523, 534 (2024) (citando a R. Hernández Colón*, Práctica jurídica de Puerto Rico: derecho procesal civil,* 6ta ed., San Juan*,* Ed. Lexis Nexis, 2017, pág. 307).

Ahora bien, para que prevalezca una moción de desestimación al amparo del inciso (5) de la precitada regla, la parte demandada "debe establecer con toda certeza que la parte demandante no tiene derecho a remedio alguno bajo cualquier estado de derecho que

---

[38] La Regla 6.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 6.1, regula los elementos concernientes a las alegaciones, a saber: (1) una relación sucinta y sencilla de los hechos demostrativos de que la parte peticionaria tiene derecho a un remedio, y (2) una solicitud del remedio a que crea tener derecho. Podrán, también, ser solicitados remedios alternativos o de diversa naturaleza. *Íd.* **Lo anterior responde a que "en nuestra jurisdicción rige la norma procesal de que las alegaciones tienen el único propósito de notificarle a la parte demandada a grandes rasgos, cuáles son las reclamaciones en su contra y ésta pueda comparecer si así lo desea**". (Énfasis nuestro). *Torres, Torres v. Torres et al.,* 179 DPR 481, 501 (2010); *Sánchez v. Aut. de los Puertos,* 153 DPR 559, 569-570 (2001).

pueda ser probado en apoyo a su reclamación, aun interpretando la demanda de la forma más liberal posible a su favor". *Díaz Vázquez et al. v. Colón Peña et al.*, 2024 TSPR 113; 214 DPR___ (2025); *Rivera Sanfeliz et al. v. Jta. Dir. First Bank,*193 DPR 38, 49 (2015). En otras palabras, la demanda "no debe ser desestimada a menos que la razón para solicitar el remedio no proceda bajo el supuesto de derecho alguno, ni pueda ser enmendada para subsanar cualquier posible deficiencia". *Íd.*

Por último, el inciso (6) de la Regla 10.2 de Procedimiento Civil, *supra,* permite solicitar la desestimación por falta de parte indispensable. En armonía con la disposición aludida, la Regla 16.1 de Procedimiento Civil, 32 LPRA Ap. V., R. 16.1, establece quién es una parte indispensable:

> **Las personas que tengan un interés común sin cuya presencia no pueda adjudicarse la controversia**, se harán partes y se acumularán como demandantes o demandadas, según corresponda. Cuando una persona que deba unirse como demandante rehúse hacerlo, podrá unirse como demandada. (Énfasis nuestro).

Cónsono con lo anterior, la jurisprudencia vigente reconoce que la parte indispensable es aquella de la cual no se puede prescindir, y cuyo interés en la cuestión es de tal magnitud, que no puede dictarse un decreto final entre las otras partes sin lesionar y afectar radicalmente sus derechos. *Inmob. Baleares et al. v. Benabe et al.,* 214 DPR 1109, 1120 (2024); *Pérez Ríos et al. v. CPE*, 213 DPR 203, 212 (2023). Así pues, "[u]na parte se convierte en indispensable cuando la controversia no puede adjudicarse sin su presencia ya que sus derechos se verían afectados". *Rivera Marrero v. Santiago Martínez,* 203 DPR 462, 479 (2019); *Bonilla Ramos v. Dávila Medina,* 185 DPR 667, 677 (2012).

Por trascendencia, "la falta de parte indispensable es un planteamiento tan vital que se puede presentar en cualquier momento, lo que incluye que se presente por primera vez en

apelación. Incluso, el tribunal también puede levantarlo motu *proprio*". *Inmob. Baleares et al. v. Benabe et al., supra,* pág. 1121; *Pérez Ríos et al. v. CPE, supra,* pág. 213. Ello, pues, "la omisión de traer a una parte indispensable al pleito constituye una violación al debido proceso de ley que la cobija". *Romero v. S.L.G. Reyes,* 164 DPR 721, 733 (2005). De modo que, "la sentencia que se emita en ausencia de parte indispensable es nula". *FCPR v. ELA et al.*, 211 DPR 523, 531 (2023); G*arcía Colón et al. v. Sucn. González,* 178 DPR 527, 550 (2010).

### C. *Legitimación activa*

Nuestro sistema de tribunales está limitado por la doctrina de justiciabilidad que dimana del principio de autolimitación judicial. A la luz de esta normativa, se requiere la existencia de un caso o controversia real para que un tribunal pueda ejercer válidamente su jurisdicción. *Rivera et al. v. Torres et al.*, 214 DPR 111, 132 (2024); *Hernández, Santa v. Srio. de Hacienda, Santa*, 208 DPR 727, 738 (2022). Así que, "[l]os tribunales solo debemos intervenir en controversias reales y vivas, en las cuales existan partes con intereses encontrados cuyo propósito sea obtener un remedio que tenga un efecto sobre la relación jurídica". *Lozada Sánchez et al. v. JCA,* 184 DPR 898, 912 (2012); *Asoc. Fotoperiodistas v. Rivera Schatz, supra*, pág. 931.

En consonancia con lo discutido, conviene explicar que, una controversia no es justiciable cuando una de las partes carece de legitimación activa. *Ramos, Méndez v. García García,* 203 DPR 379, 394 (2019); *Bhatia Gautier v. Gobernador*, 199 DPR 59, 69 (2017). **La legitimación activa es la capacidad que se le requiere a la parte reclamante de una acción para comparecer como litigante ante el tribunal, realizar con eficiencia actos procesales y, de esta forma, obtener una sentencia vinculante**. *DACO v. LUMA y otros,* 2025 TSPR 126, 216 DPR ___ (2025); *Rivera et al. v. Torres et*

*al., supra,* pág. 133 (citando a *Hernández, Santa v. Srio. de Hacienda, supra,* pág. 739). Al amparo de esta doctrina, el reclamante debe demostrar que: (1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una conexión entre el daño sufrido y la causa de acción ejercitada, y (4) la causa de acción surge al palio de la Constitución o de una ley. *Hernández, Santa v. Srio. de Hacienda,* pág. 739; *Bhatia Gautier v. Gobernador, supra,* pág. 69. En esencia, a tenor con lo anterior, le corresponde al demandante demostrar "que tiene un interés en el pleito de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia". *Sánchez et al. v. Srio. de Justicia et al.,* 157 DPR 360, 371 (2002); *Hernández Agosto v. Romero Barceló,* 112 DPR 407, 413 (1982).

### D. *Injunction estatutario de conformidad con la Ley Núm. 161-2009*

La Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley Núm. 161-2009, según enmendada, 23 LPRA sec. 9011, ("Ley Núm. 161-2009"), establece el marco legal y administrativo respecto a las solicitudes, evaluaciones, concesiones y denegatorias de permisos que inciden en el desarrollo económico de Puerto Rico. Véanse, además, *Capó Cruz v. Jta. Planificación et al.* 204 DPR 581, 592 (2020); *Laureano v. Mun. de Bayamón,* 197 DPR 420, 433 (2017); *Horizon v. Jta. Revisora, RA Holdings,* 191 DPR 228, 236 (2014). Esta legislación se promulgó con el propósito de atender el problema existente con el proceso de otorgación de permisos para el desarrollo de obras de construcción en nuestra jurisdicción. *FCPR v. ELA et al, supra,* pág. 537. A tales fines, la Ley Núm. 161-2009, *supra,* ordena la creación de la Oficina de Gerencia de Permisos ("OGPe"). En virtud de esta pieza legislativa, la OGPe y el Profesional

Autorizado evaluarán, concederán o denegarán permisos, según lo dispone la Exposición de Motivos de la referida legislación:

> **En términos generales, la Oficina de Gerencia y el Profesional Autorizado evaluarán y concederán o denegarán los permisos que hasta ahora están bajo la jurisdicción de la Administración de Reglamentos y Permiso a mayor parte de las consultas de ubicación que actualmente son de la jurisdicción de la Junta de Planificación; los permisos, y las recomendaciones que actualmente emiten numerosas entidades gubernamentales con relación al desarrollo y uso de terrenos. La Oficina de Gerencia de Permisos, por medio de los Gerentes determinará cumplimiento ambiental de toda acción sujeta a un análisis de impacto ambiental bajo la Ley Núm. 416 de 22 de septiembre de 2004, según enmendada, conocida como "Ley de Política Pública Ambiental de Puerto Rico"; y luego de entrar en acuerdos interagenciales, expedirá permisos, certificados, licencias o documentos gubernamentales requeridos para propósitos de construcción y usos de terrenos, y para realizar u operar negocios en Puerto Rico. La Oficina de Gerencia contará con moción unidades especializadas para evaluar el cumplimiento de cada una de las solicitudes presentadas a través de las recomendaciones**. (Énfasis nuestro).

Obsérvese que, la OGPe goza de jurisdicción primaria para conceder y denegar permisos de conformidad a los reglamentos aplicables y las legislaciones vigentes.

En lo pertinente a este recurso, es menester puntualizar que, la determinación final que dicte la OGPe no tiene la consecuencia de invalidar las condiciones restrictivas que rigen un lugar. Ello, pues, **"obtener un permiso de uso de una agencia administrativa no tiene el efecto ni el alcance de anular restricciones privadas que resultan inconsistentes con el permiso concedido"**. *Residentes Parkville v. Díaz*, 159 DPR 374, 392 (2003) (citando a *Sabater v. Corp. Des. Eco. Del Pastillo, Inc.*, 140 DPR 497, 508 (1996)) (Énfasis nuestro).

Por otro lado, resulta importante establecer que, las determinaciones finales alcanzadas por la OGPe **gozan de presunción de corrección y legalidad**, salvo medie fraude, dolo, engaño, extorsión, soborno o la comisión de algún delito en el otorgamiento, entre otros extremos, de conformidad con Artículo 9.10 de la Ley Núm. 161-2009, *supra*:

> **Artículo 9.10. — Certeza de los permisos. (23 L.P.R.A. § 9019i)**
>
> **Se presume la corrección y la legalidad de las determinaciones finales y de los permisos expedidos por la Oficina de Gerencia de Permisos, por el Municipio Autónomo con Jerarquía de la I a la V y por los Profesionales Autorizados. No obstante, cuando medie fraude, dolo, engaño, extorsión, soborno o la comisión de algún otro delito en el otorgamiento o denegación de la determinación final o del permiso, o en aquellos casos en que la estructura represente un riesgo a la salud o la seguridad, a condiciones ambientales o arqueológicas, la determinación final emitida y el permiso otorgado por la Oficina de Gerencia de Permisos, por el Municipio Autónomo con Jerarquía de la I a la V o por el Profesional Autorizado, deberá ser revocado.** La estructura se podrá modificar, conservar o demoler, sólo después de que un Tribunal competente así lo determine y siguiendo con el procedimiento judicial establecido en el Capítulo XIV de esta Ley, además de cumplir con el debido proceso de ley. (Énfasis nuestro).

A su vez, el aludido artículo contempla el trámite para la impugnación de las determinaciones finales emitidas por la OGPe:

> **[S]e dispone que, bajo ninguna circunstancia, una determinación final será suspendida, sin mediar una autorización o mandato judicial de un Tribunal competente o el foro correspondiente, en estricto cumplimiento con el debido proceso de ley. Las disposiciones de este Artículo no crearán un precedente reclamable por terceros ajenos a la propiedad objeto del permiso. Entendiéndose que, sujeto a lo dispuesto en esta Ley, una determinación final se considerará final y firme, o un permiso, y no podrá ser impugnado una vez el solicitante haya <u>cumplido con todos los requisitos establecidos en la notificación de determinación final y haya transcurrido el término de veinte (20) días sin que una parte adversamente afectada por la notificación haya presentado un recurso de revisión o un proceso de revisión administrativa, así como haya transcurrido el término de treinta (30) días para solicitar revisión judicial</u>. No obstante, la parte adversamente afectada por una determinación final podrá ser revisada sujeto a lo establecido en esta Ley**.
>
> **De igual manera, tales permisos deberán ser sostenidos en su legalidad y corrección por las Entidades Gubernamentales Concernidas frente a ataques de terceros. Cuando medie fraude, dolo, engaño, extorsión, soborno, o la comisión de algún delito en el otorgamiento del permiso, o en aquellos casos en que la estructura represente un riesgo a la salud, la seguridad, a condiciones ambientales o arqueológicas, y sujeto a lo dispuesto en esta Ley, el permiso otorgado por la Oficina de Gerencia, por el Municipio Autónomo con Jerarquía de la I a la V o por el Profesional Autorizado, deberá ser revocado. <u>La obra deberá ser modificada, conservada o demolida, sólo después de que el foro administrativo o judicial competente así lo determine y siguiendo con el procedimiento judicial establecido en el Capítulo XIV de esta Ley, además de cumplir con el debido proceso de ley</u>.** 23 LPRA sec. 9019i. (Énfasis nuestro y citas omitidas).

Ahora bien, la Ley Núm. 161-2009, *supra,* permite a una parte con un interés propietario o personal, que pudiese verse afectado, presentar ante el foro primario una solicitud de recurso extraordinario con el fin de peticionar: (1) la revocación de un permiso, (2) la paralización de una obra, o (2) la demolición de obras, entre otros remedios. *Díaz Vázquez et al. v. Colón Peña et al.*, 214 DPR 1134, 1144 (2024). A tales efectos, el Artículo 14.1 del precitado texto legislativo preceptúa quién goza de legitimación activa para solicitar este *injunction* de naturaleza estatutaria:

> **La Junta de Planificación, un Municipio Autónomo con Jerarquía de la I a la III, una Entidad Gubernamental Concernida que haya determinado que sus leyes y reglamentos han sido violados, o <u>cualquier persona privada, natural o jurídica, que tenga un interés propietario o personal que podría verse adversamente afectado, podrá presentar una acción de injunction, mandamus, sentencia declaratoria, o cualquier otra acción adecuada para solicitar</u>: 1) la revocación de una determinación final otorgada, cuya solicitud se haya hecho utilizando información incorrecta o falsa; 2) la paralización de una obra iniciada sin contar con las autorizaciones y permisos correspondientes, o incumpliendo con las disposiciones y condiciones del permiso otorgado; 3) la paralización de un uso no autorizado O de una construcción autorizada mediante permiso, para la cual no se hayan realizado los pagos correspondientes a aranceles, pólizas, arbitrios y sellos; 4) la demolición de obras construidas, que al momento de la presentación del recurso y al momento de adjudicar el mismo no cuenten con permiso de construcción, ya sea porque nunca se obtuvo o porque el mismo ha sido revocado.**

El referido artículo establece, además, quiénes son partes indispensables, según se presente la causa de acción de *injunction* estatutario al amparo de esta ley:

> **En los casos <u>en los que se solicite la revocación</u> de una determinación final, será parte indispensable de en el pleito <u>la entidad o profesional autorizado</u> que haya emitido la determinación final y el dueño del proyecto. Además, en los casos en los que se <u>solicite la revocación de un permiso otorgado por haberse utilizado información incorrecta o falsa y que dicho permiso se haya expedido bajo las disposiciones de la Ley Núm. 135 de 15 de junio de 1967</u>, según enmendada, dicho <u>ingeniero o arquitecto</u> también será parte indispensable ponle en el pleito**. 23 LPRA sec. 9024. (Énfasis nuestro).

Este remedio estatutario está disponible para procurar la intervención judicial de forma sumaria, independientemente de que

puedan existir otros remedios o cursos de acción para reparar el agravio. *Díaz Vázquez et al. v. Colón Peña et al, supra,* pág. 1152. En ese sentido, el Tribunal Supremo de Puerto Rico ha reconocido que "el *injunction* estatutario es independiente del tradicional y, por consiguiente, generalmente exento de la normativa aplicable a este último. Ello, pues, hemos establecido que los requisitos del *injunction* tradicional son más rigurosos que los exigidos para el estatutario". *Next Step Medical v. Bromedicon et al.,* 190 DPR 474, 497 (2014); *CBS Outdoor v. Billboard One, Inc. et al.,* 179 DPR 391, 409 (2010).

### E. Injunction

El recurso de *injunction* se rige por la Regla 57 de Procedimiento Civil, 32 LPRA Ap. V, R. 57, y el *Código de Enjuiciamiento Civil de Puerto Rico* de 1933, Ley Núm. 6 del 31 de marzo de 1933, 32 LPRA 3421, según enmendada. Este último define el recurso de *injunction* como sigue:

> El *injunction* es un mandamiento judicial expedido por escrito, bajo el sello de un tribunal, por el que se requiere a una persona para que se abstenga de hacer, o de permitir que se haga por otras bajo su intervención, determinada cosa que infrinja o perjudique el derecho de otra. 32 LPRA sec. 3421.

Este recurso extraordinario "es un mandamiento judicial en virtud del cual se requiere que una persona se abstenga de hacer, o de permitir que se haga, determinada cosa que infrinja o perjudique el derecho de otra". *Buxó Santiago v. ELA et als.,* 2024 TSPR 130, 215 DPR ___ (2024); *Next Step Medical v. Bromedicon, supra,* págs. 485-86. En consonancia con esta normativa, la Regla 57.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 57.3, enumera los criterios para la expedición del *injunction* preliminar:

> Al decidir si expide una orden de entredicho provisional o *injunction* preliminar, el tribunal deberá considerar, entre otros, los siguientes:
>
> > a. La naturaleza del daño a que está expuesto la parte peticionaria;

b. la irreparabilidad del daño o la inexistencia de un remedio adecuado en ley;

c. la probabilidad de que la parte promovente prevalezca;

d. la probabilidad de que la causa se torne en académica;

e. el impacto sobre el interés público del remedio que se solicita, y

f. la diligencia y la buena fe con que ha obrado la parte peticionaria.

De acuerdo con la interpretación jurisprudencial, el objetivo del interdicto preliminar es mantener el *status quo* hasta que se celebre el juicio, (2) impedir que la situación se torne académica o (3) evitar que se ocasionen daños mayores mientras perdura el litigio. *VDE Corporation v. F & R Contractors*, 180 DPR 21, 41 (2010); *Rullán v. Fas Alzamora,* 166 DPR 742, 764 (2006). No obstante, su concesión descansa en la sana discreción judicial, que se ejerce al ponderar las necesidades y los intereses de las partes involucradas. *Mun. de Ponce v. Gobernador,* 136 DPR 776, 790-791 (1994).

Por otro lado, el *injunction* permanente amerita la celebración de vista y la consideración de la mayor parte de los criterios aquí aludidos. *Mun. de Loíza v. Sucns. Suárez et al.*, 154 DPR 333, 367 366 (2001). Así, pues, en nuestro ordenamiento jurídico, "[p]rocede conceder una petición de *injunction* permanente si la parte que lo solicita demuestra que no tiene ningún otro remedio en ley para evitar un daño". *Senado de PR v. ELA,* 203 DPR 62, 72 (2019). En cuanto a este aspecto, constituye un daño irreparable aquel que: (1) no puede ser adecuadamente satisfecho mediante la utilización de los remedios legales disponibles, (2) no puede ser apreciado con certeza, (3) ni debidamente compensado por cualquier indemnización que pudiera recobrarse en un pleito en ley. Véanse, *Next Step Medical v. Bromedicon, supra,* pág. 499; *Misión Ind. P.R. v. J.P. y A.A.A.,* 142 DPR 656, 681 (1997).

### F. Sentencia declaratoria

La Regla 59.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 59.1, regula el mecanismo de sentencia declaratoria, tal como esboza a continuación:

> El Tribunal de Primera Instancia tendrá autoridad para declarar derechos, estados y otras relaciones jurídicas, aunque se inste o pueda instarse otro remedio. No se estimará como motivo suficiente para atacar un procedimiento o una acción el que se solicite una resolución o sentencia declaratoria. La declaración podrá ser en su forma y efectos, afirmativa o negativa, y tendrá la eficacia y el vigor de las sentencias o resoluciones definitivas. Independientemente de lo dispuesto en la Regla 37, el tribunal podrá ordenar una vista rápida de un pleito de sentencia declaratoria, dándole preferencia en el calendario.

De conformidad con lo anterior, "resulta imperativo establecer en qué circunstancias está disponible el mecanismo de sentencia declaratoria". *Alcalde de Guayama v. ELA*, 192 DPR 329, 333 (2015). Así pues, la sentencia declaratoria es un "mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita" *Senado de PR v. ELA, supra*, pág. 71; *Alcalde de Guayama v. ELA, supra*, pág. 333.

De acuerdo con el Tribunal Supremo de Puerto Rico, este recurso extraordinario puede ser dictado en todo proceso judicial en el cual "[l]os hechos alegados demuestran que existe una controversia sustancial entre partes que tienen intereses legales adversos, sin que medie lesión previa de los mismos con el propósito de disipar la incertidumbre jurídica y contribuir a la paz social". *DACO v. LUMA y otros, supra* (citando a R. Hernández Colón, *op. cit.*, pág. 623). En esencia, "[s]u propósito es la disipación de cualquier divergencia de criterio en la interpretación de un estatuto". *Buxó Santiago v. ELA et als., supra*; *Alcalde de Guayama v. ELA, supra*, pág. 333. Por tanto, "[e]stá disponible independientemente de que existan otros remedios". *Senado de PR v. ELA, supra*, pág. 71. **Ahora bien, para solicitar este remedio, la parte promovente de debe**

**tener legitimación activa, por lo cual, deberá establecer la existencia o inminencia de un daño claro y real**. *Mun. Fajardo v. Srio. Justicia et al.,* 187 DPR 245, 254-255 (2012); *Romero Barceló v. E.L.A.,* 169 DPR 460, 475 (2006).

### G. Doctrina de agotamiento de remedios

En nuestro ordenamiento jurídico, no será revisable una determinación cuando la persona afectada no haya agotado todos los remedios administrativos. *Simpson, Passalacqua v. Quirós, Betances,* 214 DPR 370, 379 (2024). Así se "procura que cuando una parte desea obtener un remedio en una agencia, dicha parte tiene el deber de utilizar todas las vías administrativas a su alcance para ello antes de recurrir al foro judicial". *Guzmán y otros v. E.L.A.*, 156 DPR 693, 711 (2002). El propósito de esta doctrina es determinar la etapa en la cual el litigante puede recurrir a los tribunales, para así evitar una intervención judicial innecesaria y a destiempo que interfiera con el cauce y desenlace normal del proceso administrativo. *AAA v. UIA*, 199 DPR 638, 656 (2018) (citando a *Procura Paciente v. MCS*, 163 DPR 21, 35 (2004)).

En virtud de lo anterior, los tribunales estamos limitados a la revisión de aquellas decisiones administrativas que cumplan con los requisitos siguientes, a saber: (1) que se trate de órdenes o resoluciones finales y (2) **que la parte adversamente afectada haya agotado todos los remedios provistos por la agencia administrativa**. *ORIL v. El Farmer, Inc.*, 204 DPR 229, 239 (2020); *Fuentes Bonilla v. ELA et al.*, 200 DPR 364, 381 (2018). De esta forma, se logra también que los pleitos lleguen al foro judicial en el momento apropiado, pues (1) se permite que la agencia desarrolle un historial completo del asunto ante su consideración; (2) evita intervenciones inoportunas de los tribunales; (3) facilita la revisión judicial; y (4) promueve la distribución eficiente de tareas entre los poderes ejecutivo y judicial. *AAA v. UIA*, 200 DPR 903, 914 (2018).

### H. Doctrina de incuria

La incuria "se ha definido como la dejadez o negligencia en el reclamo de un derecho, los cuales en conjunto con el transcurso del tiempo y otras circunstancias que causan perjuicio a la parte adversa, opera como un impedimento en una corte de equidad". *Alonso Piñero v. UNDARE, Inc.*, 199 DPR 32, 53 (2017); *Consejo Titulares v. Ramos Vázquez*, 186 DPR 311, 340 (2012). Véase, también, *Horizon v. Jta. Revisora, RA Holdings*, 191 DPR 228, 236 (2014). Esta doctrina tiene el fin de evitar premiar a una parte que se cruza de brazos aun conociendo sobre la existencia de su derecho si con ello se causa un perjuicio a la otra parte o se lesionan importantes intereses públicos o privados. *P.I.P. v. E.L.A. et al.*, 186 DPR 1, 13 (2012).

Ahora bien, es importante puntualizar que, la incuria aplica cuando no existe un término reglamentario o legislativo para realizar determinada acción, por lo que, ante la ausencia de plazo, opera el criterio de *término razonable*. *Consejo de Titulares v. Ramos Vázquez, supra*, pág. 341 (citando a *Pueblo v. Valentín*, 135 DPR 245 (1994)). No obstante, el mero transcurso del tiempo no permite aplicar automáticamente esta doctrina. *Comisión Ciudadanos v. G.P. Real Property*, 173 DPR 998, 1020 (2008). Al evaluar su procedencia, deben considerarse los siguientes aspectos, a saber: primero, si existe alguna justificación para la demora; segundo, el perjuicio que esta acarrea, y tercero, el efecto sobre los intereses privados o públicos involucrados. *Alonso Piñero v. UNDARE, Inc., supra*, pág. 54; *Consejo Titulares v. Ramos Vázquez, supra*, pág. 342. Véase, también, *Comisión Ciudadanos v. G.P. Real Property, supra*, pág. 1020.

Por último, es menester discutir que, "la doctrina de incuria en relación con remedios extraordinarios como, por ejemplo, el *injunction, mandamus* y *certiorari*". *Molini Gronau v. Corp. P.R. Dif.*

*Púb.,* 179 DPR 674, 687 (2010); *Aponte v. Srio. de Hacienda, E.L.A.,* 125 DPR 610, 618 (1990). En lo pertinente al recurso de epígrafe, el profesor Rafael Hernández Colón considera que no procede la expedición del remedio interdictal ante un escenario producto de incuria:

> (11) Incuria. No se expedirá el *injunction* si media una tardanza inexcusable en solicitarlo. Se tomará en cuenta el momento en que el demandante advino en conocimiento de los daños y de la causa de los mismos y el momento en que presenta la demanda para determinar la razonabilidad. R. Hernández Colón, *op. cit.*, pág. 593.

No obstante, al evaluar si aplica o no esta doctrina, el caso deberá ser examinado a la luz de sus hechos y circunstancias particulares. *IM Winner, Inc. v. Mun. de Guayanilla,* 151 DPR 30, 39 (2000) (citando a *Pérez, Pellot v. J.A.S.A.P.,* 139 DRP 588, 599-600 (1995)). De considerar que opera la incuria, entonces se apela a la razón y a la conciencia ante la necesidad de encontrar y proveer soluciones justas. Véanse, *Consejo Titulares v. Ramos Vázquez, supra,* pág. 342; *Torres Arzola v. Policía de P.R.,* 117 DPR 204, 209 (1986).

### III.

En el recurso de epígrafe, Paseos de Dorado nos peticiona la revocación del dictamen apelado. Argumenta que el foro primario incidió al desestimar la *Segunda Demanda Enmendada.* Arguye que tal actuación contraviene con la *Sentencia* emitida el 12 de noviembre de 2025 por el Tribunal de Apelaciones (Panel X), la cual determinó expedir el *injunction* preliminar, y, ordenó la celebración de vista de *injunction* permanente. Igualmente, aduce que no procedía aplicar la doctrina de incuria, pues siempre actuó con diligencia en la tramitación del pleito.

De manera similar, en virtud de su recurso, DBR alega que el tribunal sentenciador erró al declarar *Con Lugar* la *Moción de Reconsideración*, y en su consecuencia, al dejar sin efecto la *Orden*

que autorizó su intervención en el pleito como parte con interés. Asimismo, señala que el *foro a quo* incidió al desestimar las reclamaciones de *injunction* permanente y sentencia declaratoria que procuraban la nulidad de la *Escritura de Liberación* e impedir la violación de las condiciones restrictivas.

De entrada, establecemos que, primero discutiremos por separados los señalamientos de error esbozados en el recurso presentado por Paseos de Dorado. Una vez atendamos su escrito, procederemos a expresarnos finalmente en cuanto al recurso radicado por DBR. Con esto mente, pasemos a resolver la controversia ante nuestra consideración.

Luego de un análisis sosegado de los recursos que nos ocupan, determinamos que el foro primario actuó conforme a derecho al desestimar la *Segunda Demanda Enmendada* instada por Paseos de Dorado. Adelantamos que la *Sentencia* apelada atiende los múltiples problemas de jurisdicción que privan al tribunal sentenciador de adjudicar el caso en sus méritos. Ahora bien, aunque el foro *a quo* procedió correctamente al desestimar dicha reclamación, somos del criterio de que, debió, en primer lugar, examinar el caso a tenor con la doctrina de legitimación activa. Veamos.

Surge del historial procesal que, desde el 20 de octubre de 2025, Dawn Hotel y Paseo San Antonio sometieron *Moción en Cumplimiento de Orden y para Reiterar la Solicitud de Desestimación,* mediante la cual cuestionaron la autoridad de la Asociación para radicar el pleito presente.[39] En esencia, alegaron que Paseos de Dorado no cuenta con la aprobación del setenta y cinco por ciento (75%) o más de sus miembros, de conformidad con el Artículo IV,

---

[39] *Véase,* SUMAC TPI, Entrada 137.

inciso (2), de los *By-Laws*, para instar la *Demanda* de epígrafe. Coincidimos con tal razonamiento.

**Ante estas circunstancias, conviene destacar que, el estado de derecho imperante requiere, como deber ministerial, que todo tribunal ausculte si ostenta o no jurisdicción para adjudicar una controversia.** Véanse, *Maldonado v. Junta de Planificación, supra*, pág. 55; *Carattini v. Collazo Syst. Analysis, Inc.*, pág. 355. **Advertimos, a su vez que, al examinar la jurisdicción, los foros adjudicadores deben considerar, como cuestión principal, que la parte demandante goza de legitimación activa para incoar el pleito. A la luz de esta doctrina, los tribunales examinan si la parte reclamante tiene capacidad para comparecer como litigante, realizar con actos procesales eficaces, y obtener así una sentencia vinculante.** Véanse, *DACO v. LUMA y otros, supra*; *Rivera et al. v. Torres et al.*, *supra*, pág. 133 (citando a *Hernández, Santa v. Srio. de Hacienda, supra,* pág. 739).

**Sin embargo, como indicamos, no consta en el expediente ante nos que, el tribunal sentenciador haya efectuado el examen de legitimación activa. Simplemente, se limitó en el escolio (1) de la *Sentencia* apelada a indicar que "dado que la demanda se desestima por otros fundamentos independientes, este Tribunal no entra a resolver esta cuestión".**[40]   No empece a lo antes expuesto, consignó la siguiente expresión en la referida nota al calce:

> **Surge del expediente que la Junta de Directores sometió a referéndum el curso de acción a seguir respecto a esta controversia, pero que solo el sesenta y cinco por ciento (65%) de los votos emitidos —de una participación del cuarenta y uno por ciento (41%) de los miembros— favoreció proseguir con la acción legal.** (Citas omitidas).[41]

**Por consiguiente, como parte de nuestro deber ministerial, nos vemos en la obligación de atender el**

---

[40] *Véase*, SUMAC TPI, Entrada 202, pág. 4 esc. 1.
[41] *Véase*, SUMAC TPI, Entrada 202, pág. 4 esc. 1.

**señalamiento presentado en cuanto a la ausencia de legitimación activa de la Asociación, el cual es el factor principal que incide la jurisdicción de este caso. En vista de ello, debemos enfatizar que, la falta de jurisdicción es un asunto que puede levantarse en etapa apelativa y a iniciativa propia de este Tribunal por las consecuencias drásticas que acarrea.** Véanse, *MCS Advantage v. Fossas Blanco et al., supra,* pág. 145; *Beltrán Cintrón et al. v. ELA et al., supra,* págs. 101-10. **Así precisado, pasemos a discutir este asunto detenidamente.**

A la luz de lo anterior, contemplamos que Paseos de Dorado no acreditó ante el foro *a quo* que cuenta con la autorización correspondiente para incoar la reclamación presente, de conformidad con los estatutos que rigen la Asociación, los cuales constituyen ley entre las partes. Véase, *Carmona, Negrón v. BSN y otros,* 214 DPR 388 (2024).[42] Ello, pues, el Artículo IV, inciso (2), de los *By Laws de Paseos de Dorado Property Owners Association, Inc., A Non-Profit Corporation,* preceptúa el requisito de setenta y cinco (75%) por ciento o más de los votos de sus miembros para la aprobación de una acción, según lee a continuación:

> **2. Members to Have Power of Referendum in Certain Instances. The Members, or some specific portion thereof, shall have the power to approve or reject certain actions proposed to be taken by the Association by Referendum including, without limitation, whether the Association shall accept any offer by the Owner/Developer to convey to the Association ahy "Comnon Properties", the levy by the Association of any special assessment in excess of those authorized by the Covenants, and the addition or deletion of functions or services which the Association is authorized to perform. <u>In the event seventy-five percent (75%) or more of the votes actually returned to the Association within the specified time shall be in favor of such action, the Referendum shall be deemed to "pass" and the action voted upon will be deemed to have been authorized by the Members;</u> provided, however, that if a higher percentage vote required to "pass" shall be specifically**

---

[42] En el precitado caso, el Tribunal Supremo de Puerto Rico reitera, mediante *Opinión,* que "**los reglamentos de una organización son parte del contrato que regula la relación entre dicha entidad y sus miembros. En ese sentido, los reglamentos constituyen la ley entre las partes, en tanto no atenten contra el ordenamiento jurídico, la moral ni el orden público**". *Carmona, Negrón v. BSN y otros, supra,* pág. 398; *González Aristud v. Hosp. Pavía,* 168 DPR 127, 137 (2006). (Énfasis nuestro).

**expressed herein or in the Covenants, that higher percentage shall control in that instance. The Board of Directors may not undertake any action requiring a Referendum without complying with the provisions therefor**. (Énfasis nuestro).[43]

A su vez, consta en el expediente ante nos, el formulario de votaciones de la Asociación, el cual incluye la siguiente expresión concerniente al por ciento de votos requeridos para instar la acción legal:

> La Junta, en representación de todos los titulares de Paseos de Dorado, está obligada a hacer valer las Condiciones Restrictivas incluso hasta llegar a un procedimiento judicial, de ser necesario. **A tales efectos se sometería una petición para que se dicte una orden de interdicto solicitando detener la construcción del proyecto**. De acuerdo con la opción del bufete contratado, ver adjunto, el precedente legal nos favorece en nuestro reclamo. Por tanto, la misión es proteger y mantener las condiciones restrictivas, defendiendo así nuestra comunidad, y evitando situaciones similares a futuro que puedan tener un impacto en otras áreas de nuestra comunidad y/o afecta los valores de nuestras propiedades. **No obstante, en la eventualidad que el setenta y cinco por ciento (75%) de los votos recibidos en contestación al referéndum no apoye que la Junta de Directores continúe con los procedimientos legales para detener la construcción del proyecto, no se tomará dicha acción**. (Énfasis nuestro).[44]

No obstante, el 30 de abril de 2025, la Asociación cursó una carta intitulada *Resultados del Referéndum sobre la Construcción del Proyecto The Dawn Hotel at Dorado,* suscrita por la señora Migdalia Santiago, presidenta de la Junta de Paseos de Dorado. En este escrito, surge la siguiente información respecto a la votación en torno a la acción legal:

> **Durante la tarde del 29 de abril de 2025, en presencia de un Notario, todos los miembros de la Junta y dos observadores, se llevó a cabo el conteo de votos. De un total de 312 votos adjudicados, 109 votos estuvieron en contra que la Junta continuara los esfuerzos para proteger las Condiciones Restrictivas, lo que representa un treinta y cinco por ciento (35%). Por el contrario, el mandato de una mayoría significativa fue en apoyo a que la Junta continuará con las acciones legales previamente comunicadas, por lo cual se procederá de conformidad con dicho mandato**. (Énfasis nuestro).[45]

---

[43] *Véase*, SUMACT TPI, Entrada 137, Anejo 1 (*Estatutos de Paseos de Dorado*), págs. 3-4.

[44] *Véase*, SUMACT TPI, Entrada 137, Anejo 2 (*Convocatoria de Referéndum*), pág. 1.

[45] *Véase*, SUMACT TPI, Entrada 127, Anejo 3 (*Resultados del Referéndum*), pág. 1.

A tenor con lo anterior, concluimos que, Paseos de Dorado no demostró mediante la prueba documental presentada que cuenta con los votos del setenta y cinco por ciento (75%) o más de sus miembros para instar la reclamación de epígrafe de conformidad con el precitado estatuto. En vista de ello, razonamos que, carece de legitimación activa para comparecer ante el foro primario, realizar actos procesales eficaces y, obtener así ,una sentencia vinculante, según preceptúa la jurisprudencia aplicable. En efecto, la inobservancia de este criterio medular priva inmediatamente el foro *a quo* de asumir la jurisdicción.

**No obstante, al igual que el tribunal sentenciador, somos conscientes de que existen también otros factores que limitan el alcancen de su jurisdicción. Por haberse considerados tales aspectos en el dictamen aquí impugnado, debemos pronunciarnos al respecto. Veamos.**

En los señalamientos de error (1), (2) y (3) Paseos de Dorado arguye que el foro primario erró al desestimar las causas de acción en torno al injunction *preliminar* y permanente. Aduce que, tal actuación contraviene con la *Sentencia* notificada el 12 de noviembre de 2025 por este Tribunal de Apelaciones (Panel X), mediante la cual se concedió el interdicto preliminar solicitado. Indica que, en virtud del referido dictamen, este Foro Intermedio ordenó la celebración de vista de *injunction* permanente para adjudicar la legalidad de la *Escritura de Liberación* en sus méritos. No le asiste la razón.

Precisamos que, al momento en que este Tribunal de Apelaciones dictó dicha *Sentencia,* en la cual otorgó el remedio interdictal preliminar, y ordenó la celebración de la vista de *injunction* permanente, se encontraban pendientes de adjudicar siete (7) mociones de desestimación por falta de jurisdicción y sus respectivas oposiciones. Tal es el caso que cuando el Tribunal Supremo de Puerto Rico devolvió el asunto al foro primario, se

celebró *Vista sobre el Estado de los Procedimientos*, en la cual se discutió este particular, según consta en la *Minuta* notificada el 27 de enero de 2026:

> **Iniciados los procedimientos, el Tribunal hace constar que no se va a atender la Moción de Reconsideración, presentada por el licenciado Martínez Piovanetti, hasta que notifique la moción con relación a la jurisdicción.**
>
> [...]
>
> **El licenciado Martínez manifiesta que la moción de desestimación presentada en el mes de agosto ya está sometida y no se ha contestado la demanda, pero está preparado para contestar la misma, una vez el Tribunal lo disponga.**
>
> [...]
>
> **El Tribunal se compromete a notificar las dos mociones de desestimación el 12 de febrero de 2026, antes del mediodía.** (Énfasis nuestro).[46]

**Se desprende de la *Minuta* aludida que, en la celebración de dicha vista, las partes fueron debidamente apercibidas por el tribunal sentenciador en cuanto a las mociones de desestimación pendientes de adjudicar.** Ante esta realidad, reconocemos que, una vez regresado el caso ante su consideración, el foro primario actuó correctamente al no celebrar la vista de *injunction* permanente, y desestimar dicha causa de acción, tras constatar que carecía de jurisdicción.

A su vez, resaltamos que, el tribunal sentenciador desestimó la causa de acción de interdicto permanente por entender que Paseos de Dorado no procedió de manera diligente al radicar el pleito. Para sostener tal determinación, brindó el siguiente razonamiento, el cual acogemos en este dictamen, puesto que es consistente con el derecho vigente y es cónsono con la evidencia obrante en el expediente:

> **De manera determinante, de la propia faz de la demanda surge que la reclamación de la Asociación respecto a las condiciones restrictivas está impedida por la defensa de incuria. Los hechos alegados establecen inequívocamente que: (1) la consulta de ubicación fue anunciada mediante rótulos visibles para la Urbanización Paseos de Dorado desde 2020 y mediante la notificación formal de dicho procedimiento administrativo a Paseo**

---

[46] Véase, SUMAC TPI, Entrada 198, págs. 1-3.

**Las Palmas; (2) la Asociación no presentó impugnación alguna durante más de cuatro años, formulando su primera comunicación respecto a las condiciones restrictivas apenas el 27 de enero de 2025, según surge del propio párrafo 63 de la Segunda Demanda Enmendada; (3) durante ese período, según alegan los codemandados en sus escritos y se puede inferir razonablemente de las alegaciones de la demandante, The Dawn invirtió cuantiosas sumas en el proyecto, incluyendo fondos federales y préstamos de múltiples instituciones financieras, además de asumir compromisos contractuales para la creación de empleos; y (4) el proyecto hotelero comenzó a construirse en el 2024 y no fue hasta julio de 2025 que se presentó la demanda de epígrafe, cuando ya la construcción estaba en progreso.**

**Este Tribunal no considera las alegaciones de los codemandados sobre el monto específico de las inversiones realizadas, pues la presente determinación se hace al amparo de una moción de desestimación y no tras la celebración de vista evidenciaria. No obstante, lo que sí surge claramente de la propia Segunda Demanda Enmendada es que la Asociación conocía o debía conocer del proyecto desde 2020 -cuando la consulta de ubicación fue anunciada públicamente mediante rótulos visibles y la notificación formal a Paseo Las Palmas- y permaneció inactiva por más de cuatro años antes de incoar la presente acción.**

**La demora de más de cuatro años en reclamar es inexcusable. Si la Asociación consideraba que el proyecto hotelero violaba las condiciones restrictivas alegadas, debió actuar con diligencia para proteger sus supuestos derechos. En cambio, permaneció inactiva mientras los codemandados adelantaban sustancialmente y de buena fe el desarrollo del proyecto. Quien pide equidad debe actuar con equidad, y la conducta de la Asociación no satisface este requisito fundamental. La defensa de incuria es plenamente aplicable y determinante en el presente caso.**[47] (Énfasis nuestro).

Acorde con lo dispuesto, concluimos que procede la desestimación del *injunction* permanente por motivo de incuria. Resulta improcedente conceder tal interdicto, toda vez que la Asociación se cruzó de brazos y no actuó con la premura que amerita este tipo de remedio extraordinario. Véase, *P.I.P. v. E.L.A. et al., supra,* pág. 13. Recordemos que, en nuestro ordenamiento jurídico, no se expedirá el *injunction* si media tardanza inexcusable en solicitarlo, como ocurrió en este caso. Véanse *Molini Gronau v. Corp. P.R. Dif. Púb., supra,* pág. 687; *Aponte v. Srio. de Hacienda, E.L.A., supra,* pág. 618; R. Hernández Colón, *op. cit.,* pág. 593. Por

---

[47] *Véase,* SUMAC TPI, Entrada 202, págs. 26-27.

consiguiente, resolvemos que los errores (1), (2) y (3) no se cometieron.

Atendido lo anterior, nos corresponde discutir individualmente el señalamiento de error (4), en el cual Paseos de Dorado sostiene que el foro primario incidió al desestimar la causa de acción sexta concerniente a la solicitud de sentencia declaratoria para que se reconozca su derecho sobre la estructura de acceso controlado ubicada en la Avenida Principal Norte. De nuevo, no le asiste la razón.

En la atención de este argumento, establecemos que las alegaciones presentadas por Paseos de Dorado en cuanto a la sentencia declaratoria no cumplen con el estándar de plausibilidad que gobierna nuestro sistema procesal. En esa dirección, evaluamos las alegaciones conjuntamente y de manera favorable a la parte reclamante, sin embargo, resolvemos que los hechos alegados no justifican la concesión de dicho remedio. A tales fines, esbozamos las siguientes alegaciones que constan en la *Segunda Demanda Enmendada* concerniente a la sentencia declaratoria:

138. **Por información y creencia, la Avenida Principal Norte fue construida en la Finca Principal como parte del desarrollo de Paseos de Dorado posterior a que se otorgara la Escritura # 12.**

139. **Al momento de presentarse esta Demanda, la Asociación desconoce si la titularidad de la Avenida Principal Norte fue transferida al Muncipio de Dorado cuando fue construida como parte de la urbanización Paseos de Dorado.**

140. **Toda vez que la Asociación desconoce si hubo una transferencia, y que la Escritura #12 establece que la Asociación está autorizada a ser dueña de las casetas de seguridad y de carreteras, la Asociación entiende que es la titular del control de Acceso de la Avenida Principal Norte, y/o tiene un derecho real sobre dicho acceso**.

141. **La Asociación tiene información de que por más de veinticinco (25) años, desde que se construyó el primer proyecto residencial de Paseo Real, los residentes de las urbanizaciones de Paseos de Dorado han utilizado la estructura de control de acceso ubicada en la Avenida Principal Norte, la cual incluye un carril de residentes con valla de acceso.**

142. Por información y creencia, las estructuras de control de acceso de la urbanización ubicadas en la Avenida Principal Norte están construidas allí desde antes que se segregara la Finca # 13,041 de la Finca Principal.

143. Cuando Gil adquirió la Finca # 13,041 el 13 de julio de 2006, las estructuras de control de acceso de la Avenida Principal Norte permanecieron construidas allí.

144. Cuando Paseo San Antonio adquirió la Finca # 13,041 de Gil el 17 de octubre 2007, las estructuras de control de acceso de la Avenida Principal Norte permanecieron construidas allí.

145. Por información y creencia, debería haber un derecho real inscrito del control de acceso que gozan los titulares de Paseos de Dorado a través de la Avenida Principal Norte.

146. Por información y creencia, en todo momento pertinente desde hace más de veinticinco (25) años la Asociación ha actuado como titular de un derecho real sobre la estructura de control de acceso que ubica en la Avenida Principal Norte en representación de sus miembros.

147. Las estructuras del control de acceso de la Avenida Principal Norte donde ubican la caseta de guardia de seguridad, los carriles de acceso y vallas son mantenidas por la Asociación como parte de sus funciones por más de veinticinco (25) años.

148. Actualmente la Asociación le brinda mantenimiento a dichas estructuras de control de acceso

149. En la alternativa de que sea cierto que el carril de entrada de residentes de la estructura de control de acceso está ubicado en lo que hoy es la Finca #17,547, dicha porción constituye una servidumbre de paso de signo aparente a favor de los residentes de las urbanizaciones de Paseos de Dorado, conforme al Artículo 477 del Código Civil de 1930.

150. En la alternativa, las estructuras de control de acceso allí construidas constituyen una servidumbre continua y aparente que la Asociación y sus miembros adquirieron mediante prescripción adquisitiva al haber pasado más de veinte (20) años desde que los miembros de la Asociación tienen posesión de éstas. Ello, pues, la Asociación mantiene allí un guardia de seguridad.

151. En la alternativa, la Asociación advino titular del predio donde ubican las estructuras del control de acceso de la Avenida Principal Norte, y de la propia Avenida Principal Norte, por medio de prescripción adquisitiva porque es un poseedor de buena fe, a título de dueño, por más de diez (10) años. Véase Artículo 1857 del Código Civil de 1930, 31 LPRA § 5278.

152. Por todo lo cual, se solicita del Tribunal una sentencia declaratoria estableciendo que la Asociación tiene un derecho real de titularidad o servidumbre sobre las estructuras de control de

**acceso que ubican en la Avenida Norte Principal, o de la propia avenida.** (Énfasis nuestro).[48]

Una lectura detenida de estas alegaciones nos permite concluir que no constituyen una reclamación válida que amerite emitir sentencia declaratoria. Ello, pues, las alegaciones contenidas en la *Segunda Demanda Enmendada* descansan en hechos genéricos y conjeturas que la propia Asociación admite desconocer. Consecutivamente, tal redacción coloca a los Codemandados, aquí Apelados, en un estado de indefensión, pues ni siquiera pueden comprender cabalmente los hechos alegados en su contra. Ante tal realidad, reiteramos que el tribunal sentenciador procedió de manera correcta al desestimar esta causa de acción, pues deja de exponer una reclamación que justifique la concesión de un remedio, a tenor con el inciso (5) de la Regla 10.2 de Procedimiento Civil, *supra.* Por consiguiente, el error (4) tampoco se cometió.

Así dispuesto, pasemos a discutir el señalamiento de error (5). En virtud de este, Paseos de Dorado argumenta que el foro *a quo* erró al desestimar el *injunction* estatutario (primera causa de acción) y la petición de sentencia declaratoria (quinta causa de acción) para declarar la nulidad de la consulta de ubicación y el permiso de construcción. No tiene razón.

En lo pertinente a este argumento, contemplamos que la Asociación solicita la expedición del *injunction* estatutario porque considera que, durante la tramitación de la Consulta de Ubicación, Paseo San Antonio no le divulgó a la OGPe que la Finca Núm. 13,041 estaba sujeta a condiciones que prohíben el desarrollo comercial.[49] Cónsono con lo anterior, esboza las siguientes alegaciones contenidas en la *Segunda Demanda Enmendada*:

104. La Consulta de Ubicación, **los permisos de construcción y los endosos de la OGPe y el Municipio de Dorado fueron otorgados utilizando información incorrecta o falsa**, **según ya expuesto**

---

[48] Véase, SUMAC TPI, Entrada 69, págs. 25-28.
[49] *Véase*, SUMAC TPI, Entrada 69, pág. 8.

**en esta Demanda**. Por ende, se debe emitir un injunction estatutario revocando la Consulta de Ubicación, permisos de construcción y endosos conforme al Artículo 14.1 de la Ley 161-2009, y deteniendo la obra de construcción actualmente ocurriendo en la Finca # 17,547 por parte de QB Group como contratista de Dawn Hotel.

105. Una vez se obtenga la revocación de los permisos de construcción, procede la demolición del desarrollo hotelero ya comenzado conforme al Artículo 14.1 de la Ley 161-2009.

106. Por información y creencia, Dawn Hotel pretende eliminar la entrada de residentes que ubica en el control de acceso de la urbanización que ubica en la Avenida Principal Norte sin contar con el permiso del Municipio de Dorado o la agencia pertinente. Por ende, se debe emitir un injunction estatutario bajo el Artículo 14.1 de la Ley 161-2009, dirigida a Dawn Hotel y QB Group, paralizando toda obra dirigida a eliminar cualquier parte de la estructura de acceso controlado que le sirve a la urbanización Paseos de Dorado. (Énfasis nuestro).[50]

A la luz de lo anterior, evaluamos detenidamente las alegaciones relacionadas con esta causa de acción, de la manera más favorable a Paseos de Dorado. Sin embargo, constatamos que esta causa de acción tampoco justifica la concesión de un remedio a tenor con el Artículo 14.1 de la Ley Núm. 161-2009, *supra*, de conformidad con los hechos alegados. Particularmente, notamos que la Asociación no esbozó alegaciones de manera clara y concluyente, que nos permitan conceder el *injunction* estatutario peticionado al amparo de la precitada legislación. Únicamente se limitó a argumentar que Dawn Hotel y San Antonio brindaron información falsa o incorrecta ante la OGPe, mas no precisó la conducta constitutiva de tal alegación. Tampoco adujo que estos incurrieron en dolo, engaño, extorsión, soborno, o la comisión de algún delito ante la agencia, lo cual hubiera permitido atender su *Demanda*, al amparo de Artículo 9.10 de la Ley Núm. 161-2009, *supra*.

De igual forma, puntualizamos que, las alegaciones presentadas en la reclamación de epígrafe pretenden impugnar una

---

[50] Véase, SUMAC TPI, Entrada 69, págs. 19-20.

determinación final emitida por la OGPe, la cual está revestida de presunción de corrección y legalidad. Véase, Artículo 9.10 de la Ley Núm. 161-2009, *supra*.[51] Frente a este contexto, razonamos que, le correspondía a Paseos de Dorado agotar los remedios existentes a nivel administrativo para cuestionar la Consulta de Ubicación y el permiso de construcción otorgado ante la OGPe. Sin embargo, no surge del expediente que haya optado por tales alternativas. Por ende, resolvemos que, el tribunal sentenciador procedió conforme a derecho al desestimar la causa de acción de sentencia declaratoria concerniente a la solicitud de nulidad de la consulta de ubicación y el permiso de construcción.

Precisamos, además, que Paseos de Dorado tampoco incluyó en el pleito al Personal Autorizado, quien examinó el caso ante la OGPe, lo cual implica un evidente problema de ausencia de parte indispensable que afecta directamente la jurisdicción, pues es un requisito esencial de conformidad con el Artículo 14.1 de la Ley Núm. 161-2009, *supra*. Por ende, concluimos que el error (5) no se cometió.

En cuanto al señalamiento de error (6), la Asociación arguye que el tribunal sentenciador incidió al no conceder a su favor el pago en concepto de gastos y honorarios de abogados. Respecto a este asunto, establecemos que, no procede la imposición de honorarios a favor de la Paseos de Dorado, en vista de que se decretó la desestimación de la *Demanda*. Por ende, el error (6) tampoco se cometió.

Por último, nos resta expresarnos sobre el recurso presentado por DBR, quien manifiesta que el foro primario erró al dejar sin efecto la *Orden* que permitió su intervención en el pleito como parte

---

[51] **Asimismo, advertimos que, la mera expedición del permiso "no tiene el efecto ni el alcance de anular restricciones privadas que resultan inconsistentes con el permiso concedido".** *Residentes Parkville v. Díaz*, *supra*, pág. 392 (citando a *Sabater v. Corp. Des. Eco. Del Pastillo, Inc.*, *supra*, 508). (Énfasis nuestro).

con interés. No le asiste la razón. Como hemos expuesto, el foro primario está privado de jurisdicción por múltiples fundamentos para atender el caso de marras en sus méritos. Por lo que, no ostentaba tampoco autoridad para dictar la *Orden* notificada el 22 de enero de 2026, en la cual permitió la intervención de DBR.[52] Ante tales circunstancias, resolvemos que el foro *a quo* actuó correctamente al dejar sin efecto tal dictamen el cual, a todas luces, es jurídicamente inexistente o *ultravires*, por haberse emitido en ausencia de jurisdicción. Véanse, *Rodríguez Vázquez v. Hosp. Auxilio Mutuo, supra*; *Maldonado v. Junta de Planificación, supra*, pág. 55.

En virtud de lo anterior, reiteramos que el foro primario procedió correctamente al desestimar la *Segunda Demanda Enmendada* por falta de jurisdicción. Por consiguiente, confirmamos la *Sentencia* apelada, puesto que no reviste abuso de discreción, prejuicio, parcialidad ni error manifiesto en la interpretación o la aplicación de la normativa jurídica procesal y sustantiva, por parte del tribunal sentenciador.

## IV.

Por los fundamentos que anteceden, ***confirmamos*** la *Sentencia* notificada el 12 de febrero de 2026, por el Tribunal de Primera Instancia, Sala Superior de Bayamón. **Por el resultado alcanzado, dejamos sin efecto la *Resolución* que emitimos el 17 de febrero de 2026, en la cual concedimos el auxilio de jurisdicción peticionado por Paseos de Dorado Property Owners Association, Inc.**

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones

---

[52] *Véase*, SUMAC TPI, Entrada 188.